UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FAMILIES FOR ASBESTOS          )
COMPLIANCE, TESTING AND SAFETY, )
                               )
            Plaintiff,         )
                               )
        vs.                    )          No. 4:05-CV-719 (CEJ)
                               )
CITY OF ST. LOUIS, MISSOURI,   )
et al.,                        )
                               )
            Defendants.        )

## MEMORANDUM AND ORDER

This matter is before the Court on the plaintiff's motion for partial summary judgment and on defendants' motion for summary judgment. The issues are fully briefed.

Plaintiff brings a citizen suit pursuant to Section 304 of the Clean Air Act, 42 U.S.C. § 7604, and Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B). Plaintiff alleges that defendants, the City of St. Louis and the City of St. Louis Airport Authority, failed to comply with federal environmental regulations when they demolished asbestos-containing buildings in connection with an airport expansion project, thereby exposing nearby residents to dangerous levels of asbestos.

## I. Background

### A. Airport Project and Regulatory Approvals

This case arises out of a runway expansion project at Lambert St. Louis International Airport that began in 1999. The expansion required the purchase and demolition of approximately 1,900 parcels of land, consisting of vacant lots and residential and commercial

buildings. Some of the building contained asbestos in walls and joint compounds and in sprayed-on ceiling material. Plaintiff Families for Asbestos Compliance, Testing, and Safety (FACTS) is a nonprofit Missouri corporation. Its members are individuals whose homes have been or will be demolished for the runway expansion project. Plaintiff claims that the demolitions have exposed its members to dangerous levels of asbestos, may have adversely affected their health, and have reduced their quality of life and enjoyment of outdoor activities.

Demolition of the buildings containing asbestos required the defendants to comply with the National Emission Standards for Hazardous Pollutants (NESHAP), 40 C.F.R. Part 61, which are regulations promulgated by the Environmental Protection Agency pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412. The NESHAP for asbestos prescribes work practices for demolition and renovation of buildings found to contain asbestos.[1] See 40 C.F.R. § 61.145 (2000). The EPA delegated its authority to administer NESHAP to the State of Missouri, which through its Department of Natural Resources, in turn delegated its permitting authority to the St. Louis County Department of Health in connection with the airport expansion project. Thus, the

---

[1] The asbestos NESHAP is one of several NESHAPs, which also exist for benzene, mercury, arsenic, and other substances. The asbestos NESHAP regulates various activities which could release asbestos, including the building of roadways, asbestos mills, and asbestos waste disposal sites. The asbestos NESHAP is codified at Subpart M of Part 61, Chapter 40, of the Code of Federal Regulations.

defendants were required to obtain written authorization from the St. Louis County Department of Health authorizing the demolition.[2]

In 1999, before the demolition began, demolition procedures were developed with the input, coordination and approval of the St. Louis County Department of Health. The defendants retained a consultant whose duties included serving as a liaison between the regulatory agencies and the contractors and other consultants involved in the project. Thus, demolition procedures approved and permits issued by any of the involved regulatory agencies were conveyed to the liaison who, in turn, relayed them to the contractors and others.

The demolition procedures varied depending on the amount of asbestos-containing material present or assumed to be present in the structures. In the early stages of the project, the defendants were required to comply with the St. Louis County Department of Health's "Guideline for Wet Demolition." The Guideline defined "wet demolition" as follows:

> A wet demolition means a demolition of a building that is known to have or suspected of having asbestos containing material (acm). The acm is not removed prior to demolition and all resultant building debris and rubble are removed and treated as contaminated with asbestos.

The Guideline described the manner in which a wet demolition was to be conducted, including the use of water sprays as a "primary means of emission control," and outlined the safety measures that had to be in place. The Guideline allowed a building owner to apply for

---

[2]The airport is located within St. Louis County, Missouri, but it is owned by St. Louis City.

3

permission to conduct a wet demolition "rather than asbestos abatement for reasons of safety, cost and/or time," but made clear that each application would be evaluated individually. Thus, the County Department of Health would determine whether the wet demolition method would be allowed in any given case. Between October 1999 and early 2003, the defendants used the wet method to demolish numerous structures in the airport project.

In a letter dated November 13, 2002, the Missouri Department of Natural Resources (MDNR) sought the EPA's assistance in interpreting the asbestos NESHAP "regarding the requirement to remove all regulated asbestos containing materials (RACM) prior to demolition of a facility." Referring to the NESHAP's four exclusions to the requirement that all RACM be removed from a structure prior to commencement of any activity that would dislodge or disturb the material, the MDNR asked whether there was any other mechanism that could be used for demolition without first removing all of the RACM, even when none of the exclusions applied. The MDNR queried:

> For instance, could they assume that all of the materials in the building are RACM and remove the entire structure under wet conditions provided they properly package all of the demolition debris as required by 40 CFR Part 61.150 and disposed of it as asbestos containing waste at a facility meeting the requirements of 40 CFR Part 61.154?
>
> Secondly, if the above described scenario is not allowed by the NESHAP and there is no other approved mechanism by which this can be done in compliance with the rule, is there any avenue by which someone could pursue a waiver or variance from the requirement to remove all RACM prior to demolition?

By letter dated November 17, 2002, the EPA responded, in part:

> The scenario which you outlined in your letter would be acceptable under the NESHAP that is, one could assume that all of the material in the building is RACM, use wet demolition methods in accord with 40CFR 61.145(c), handle <u>all</u> of the resulting waste as RACM in accord with 40 C.F.R. 61.150, and landfill the waste in accord with 40 C.F.R. 61.154.
>
> While 40 C.F.R. 61.145(c) generally requires that all RACM be removed from a facility prior to demolition, the scenario which you have described would essentially meet the intent of the regulation in terms of protection of human health and the environment . . .

(emphasis in original)

On January 22, 2003, the EPA again wrote to MDNR providing an interpretation "superced[ing][the] November 17, 2002 letter . . .." In the January 2003 letter, Larry Hacker, the EPA Regional Asbestos Coordinator wrote:

> Subsequent to my November 17, 2002, letter to you, and based on your findings during your department's audit of the St. Louis County Health Department, we learned that the County has a policy which allows wet demolition (wet demolition with RACM in place) on a case-by-case basis. This policy is not consistent with the EPA's asbestos NESHAP regulation. Demolition with RACM in place is allowed only with respect to the four conditions [set forth at 40 CFR 61.145(c)(i)-(iv)] listed above."

After January 22, 2003, the St. Louis County Department of Health ceased issuing approvals for the defendants' use of the wet demolition method, and demolitions using the method stopped.

On March 28, 2003, the MDNR wrote to EPA that "it may be possible to develop and demonstrate an effective protocol that could allow demolition with the Regulated Asbestos Containing Material (RACM) in place" while complying with the regulation.

Specifically, MDNR suggested that the wet method would comply with 40 CFR 61.145(c)(1) under the exemption for Category II non-friable asbestos containing material "as long as there is a low probability that the material will be 'crumbled, pulverized, or reduced to powder during demolition.'"

Thereafter, negotiations took place between senior airport executives, government officials, and the EPA. As a result of their discussions, the defendants and EPA signed an "Administrative Order on Consent" (AOC) that became effective on May 1, 2003. The AOC recited that the defendants had already performed wet demolitions on 190 structures containing asbestos, and referred to the EPA's letters dated November 17, 2002, and January 22, 2003. The AOC further noted the disagreement between EPA and the defendants as to when a wet demolition process could be utilized, but stated that the EPA agreed that the defendants had acted in "good faith in [their] dealings with the agencies having jurisdiction over" the demolition of the 1,066 parcels that had already taken place.

Citing as its purpose the resolution of the disagreement, the AOC provided that the EPA, pursuant to its authority under the Clean Air Act, would authorize the defendants to use the wet demolition method on three commercial properties specifically described in the AOC. The AOC further authorized the defendants to demolish individual residential buildings "without first removing wall systems or ceilings with asbestos-containing joint compound and ceilings with asbestos texturing material so long as

all other Regulated Asbestos-Containing Material (RACM) in the building is removed prior to demolition." The AOC further stated that, after consultation with EPA, the County Department of Health could allow, "on a case-by-case basis, wet demolition of specific residential buildings without first removing RACM other than or in addition to wall systems or ceilings with asbestos-containing joint compound and ceilings with asbestos texturing material." The AOC provided that the County Health Department could use the same criteria it had previously used in evaluating whether wet demolition would be allowed for additional commercial or residential structures, "with it being the intention of the parties that wet demolition will be allowed prospectively for the current Airport Project in the same types of situations as had been allowed in the past." Attachment B to the AOC set forth the procedures for conducting wet demolition.

The AOC was effective until March 31, 2004, during which time the defendants performed demolitions of structures in accordance with the AOC and with the requisite approvals of the County Health Department or EPA. The EPA and defendants entered into a First Amendment to the AOC on August 28, 2003, which changed some of the procedures in Attachment B. The parties entered into a Second Amendment to the AOC on March 2, 2004, in which they agreed to extend the AOC until March 31, 2005.

During the effective period, the defendants conducted demolitions in accord with the AOC and the amendments thereto, and with the approvals issued by the County Department of Health.

Before entry of the AOC, 191 residential structures had been demolished using the wet method as approved by the County Department of Health, EPA and MDNR. After entry of the of the AOC, sixty-four residential structures were demolished using the wet method. The wet method was also used in the demolition of approximately eight commercial structures.[3]

On June 11, 2004, the EPA issued a "Desk Statement," stating there was an agreement between it, the County Health Department and the defendants that no further wet demolitions would be undertaken "while the EPA reviews all pertinent information regarding issues recently raised about the project." Since the issuance of the Desk Statement, the defendants have not used the wet method approved by EPA in the AOC, and they have suspended plans to demolish approximately forty structures which they had intended to wet-demolish.[4]

**B.** **Pre-Demolition Process**

---

[3] The parties submitted a list of 255 structures that were wet demolished. See Joint Stip., Pl. Exh. 1 at ¶ 4-11; Table A, Pl. Exh. 1a. Plaintiff asks the Court to focus on 100 of these wet demolitions, listed in Table B, Pl. Exh. 16A, and to declare that the city is liable for 100 violations of the NESHAP.

[4] The defendants have continued to demolish some structures by using asbestos abatement; the structures on hold are those which the defendants intended to demolish using wet demolition. In his deposition, Gerard Slay, the deputy director of the airport, explained that abatement of the asbestos cannot be used, because of the County Health Department's concern about cross-contamination. Slay testified that no protocol exists for abating joint compound and wall/ceiling texture. Thus, the demolition of these structures has been delayed pending a conclusive determination by regulatory agencies of an acceptable demolition method. See Slay Dep. at 61-63, 72-75.

The airport expansion project was a multi-year endeavor that required extensive planning and the coordinated action of many government entities and private companies. The expansion site was owned and operated by the City of St. Louis as a unitary area. The city incrementally acquired the structures (or vacant lots) in the expansion area and assigned each address a parcel number. The city then sorted the parcels into groups and assigned a demolition series number to the groups. Bids were provided and contracts were let by demolition series, rather than by individual parcel. During the early years of the project, the city notified the regional EPA office of upcoming demolitions, and those notifications were also per demolition series, not per individual parcel number. See, e.g. Def. Exh. 30.[5] The expansion site occupies a large contiguous area in Bridgeton, Missouri.

From 1999 to April 2004, Joletta Golik served as the environmental consultant for Sverdup, Parsons, Kwame (SPK), the entity that managed the demolitions at the airport expansion site. In a deposition, Golik explained the sequence of demolition notifications, which began when SPK arranged inspections of vacant buildings by Asbestos Hazard Emergency Response Act (AHERA) inspectors. The AHERA inspectors submitted one inspection form per building to SPK and to an engineering firm, which then prepared an asbestos inventory form using the inspection form. The inventory

---

[5] In September 2000, the EPA regional office informed the city it was no longer required to send notification letters to the EPA, but was required to continue to provide them to state and local governments.

forms were sent to the County Health Department, in accordance with the county's required notification process, and to demolition contractors and asbestos abatement contractors, to assist them in bidding on the project.

According to Golik, the asbestos abatement contractors then submitted to the County Health Department a detailed form (titled St. Louis County Health Asbestos Project Notification) specifying the amount and location of asbestos, how abatement was to be performed, and contingency plans if contractors found previously undiscovered asbestos during demolition. If the notification form requested permission to perform a wet demolition, Golik said, the County Health Department would sign a release authorization for asbestos abatement. Golik testified that if the County Health Department issued a permit, contractors would conduct the demolition.

Michael Mencin served as environmental manager for SPK beginning in April 2004. In his deposition, Mencin described the procedural steps as follows: Licensed asbestos inspectors took samples of building materials and created inspection report forms indicating the location and amount of asbestos-containing materials, if any were present, in each building. The inspection form was then used to create an asbestos inventory form. The airport environmental director reviewed the two forms, along with laboratory reports containing the results of the sampling performed

by the inspectors.[6] Asbestos abatement was then performed, and the demolition contractor sent the County Health Department a clearance letter listing the asbestos containing materials that remained in the building prior to demolition. The airport environmental director did not review the clearance letters before they were submitted, but he received copies of them. If the County Health Department approved, then wet demolition proceeded.

## II.  **Legal Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underly-

---

[6]     Review of the sampling results was necessary because demolition procedures varied depending on whether materials were present that contained, or were assumed to contain, greater than 1% asbestos. According to defendants, the county health department took the position that any drywall, joint compound, or wall/ceiling surfacing material containing more than 1% asbestos must be treated as regulated asbestos-containing material, to which particular provisions of the NESHAP apply. The county's position, defendants assert, was that removal of those materials could cross-contaminate other building components, and so the county would not allow contractors to remove or abate wall and ceiling systems before demolition. Instead, the county required them to demolish the entire structure using county regulations for outdoor abatement. Def. St. of Facts at ¶ 17. This issue will be discussed in a later section.

ing facts. <u>AgriStor Leasing v. Farrow</u>, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

### III. <u>Discussion</u>

Defendants argue that the single-family residences demolished in the expansion area were exempt from the asbestos NESHAP. Alternatively, they assert that the city's notification and permission procedures, as well as the wet demolition method itself, complied with the NESHAP. Defendants emphasize that each wet demolition was performed only with the supervision and approval of the county health department, MDNR, or the EPA. While the EPA ultimately withdrew its approval of the wet demolition method, defendants claim the city's good-faith efforts to cooperate with

local, state, and federal regulatory agencies absolve it of liability for NESHAP violations.

Even if the wet demolitions caused asbestos releases and contamination at the expansion site, defendants maintain, asbestos is present in such small amounts that it poses no health risk. Defendants claim that plaintiff has not shown the Resource Conservation Recovery Act's statutory requirement of imminent and substantial endangerment. Finally, defendants note that the city voluntarily has ceased to conduct wet demolitions pending a conclusive determination by the EPA that the method complies with existing laws and regulations.

Plaintiff argues that the NESHAP applies to all of the demolished structures in the airport expansion area, including single-family residences. Plaintiff asserts that the wet demolition method violates the asbestos NESHAP and § 112 of the Clean Air Act, codified at 42 U.S.C. § 7412. Plaintiff claims that the city's notification and permission procedures were faulty, because the county health department had no authority to allow demolitions that violated the asbestos NESHAP. Because the NESHAP is a strict liability statute, plaintiff argues, the existence of a health risk is irrelevant, and the city's efforts to comply with notification and permission requirements have no bearing on its liability.

Plaintiff asserts that the defendants also are liable for NESHAP violations for wet demolitions performed pursuant to the AOC, because the AOC was issued without public notice and an

13

opportunity for a hearing, and thus has no legal effect. Finally, plaintiff asserts that there is no known safe level of exposure to asbestos, and the extent of asbestos contamination in the expansion area is unknown. Plaintiff claims that the wet demolition method released airborne asbestos that settled in the soil at the expansion site, thus posing a continuing danger that asbestos will be re-suspended in the air when the soil is disturbed by lawnmowers and recreational activities.

Plaintiff asks the Court to declare that the city violated the asbestos NESHAP at least 100 times, to enjoin further use of the wet demolition method in St. Louis, and to require the city to conduct soil testing at the expansion site to determine the extent of contamination and whether remediation is necessary to protect public health.

### A. Standing

Before the Court can reach the merits of the parties' cross motions, it must establish with certainty that the plaintiff has standing to bring this suit. FACTS represents residents of Bridgeton, Missouri, who lived or live near the airport expansion area and who allege that the demolitions have exposed them to asbestos emissions and have reduced their quality of life and enjoyment of outdoor activities in the area. Exposure to toxic or hazardous substances such as asbestos "constitutes sufficient injury in fact to give a plaintiff standing to sue in federal court." Carlough v. Amchem Products, Inc., 834 F.Supp 1437, 1454 (E.D. Penn. 1993) (collecting cases involving persons exposed to a

toxin who have not manifested symptoms); <u>see also</u> <u>Friends of the</u> <u>Earth v. Laidlaw</u>, 528 U.S. 167, 183 (2000) (noting that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and the challenged activity will lessen their aesthetic and recreational enjoyment); <u>and</u> <u>Interfaith Cmty. Org. v. Honeywell Int'l, Inc.</u>, 399 F.3d 248, 255-56 (3d Cir. 2005).

Any person may initiate a suit under the Clean Air Act, and Congress has defined "person" to include individuals, corporations, partnerships, or associations. <u>St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, LLC</u>, 354 F.Supp. 2d 697, 700-705 (E.D. La. 2005); 42 U.S.C. § 7604. "An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." <u>Texans United for a Safe Economy Educ. Fund v. Crown Cent. Petroleum Corp.</u>, 207 F.3d 789, 792-93 (5th Cir. 2000).

Here, plaintiff has satisfied the above three-part test. The defendants have not fully briefed the issue of standing, although their answer briefly raised the issue. Accordingly, the Court finds that plaintiff has standing to pursue this action.

**B.** **<u>Whether residential structures demolished for the airport expansion were subject to the asbestos NESHAP</u>**

The applicable regulations are those in place at the time of the demolitions, which began in October 1999 and continued through June 2004. The NESHAP sections applicable to this case were last substantively revised in 1990, and so the Court will refer to the 1990 and 2004 versions interchangeably.[7]

Failure to comply with the asbestos NESHAP requirements automatically results in liability. United States v. Sealtite Corp., 739 F.Supp. 464, 468 (E.D. Ark. 1990). See also United States v. Tzavah Urban Renewal Corp., 696 F.Supp. 1013, 1021 (D. N.J. 1988); and United States v. MPM Contractors, Inc., 767 F.Supp. 231, 233 (D. Kan. 1990). Thus, to establish that defendants are liable for NESHAP violations, plaintiffs must show (1) that the asbestos NESHAP applied to the defendants and to the contested demolitions, and (2) that specific requirements of the NESHAP were not met. See Tzavah, 696 F.Supp. at 1021, citing United States v. Ben's Truck and Equip., 25 E.R.C. 1295, 1298 (E.D. Cal. 1986).

The parties disagree whether the single-family residences in the airport expansion project are subject to the asbestos NESHAP or fall within an exemption. The EPA has issued relevant clarifications of the NESHAP, but the parties disagree as to the legal effect of the clarifications.

The NESHAP applies to "facilities" and specifies procedures for handling asbestos-containing material therein. 40 C.F.R. §

---

[7] The statutory authority for Part 61 prior to Feb. 24, 1997 was 42 U.S.C. §§ 7401, 7412, 7416, and 7601; additional authority in 42 U.S.C. §§ 7413 and 7602 was added on that date.

61.145(a). The NESHAP defines a facility as "any institutional, commercial, public, industrial, or residential structure, installation, or building (including any structure, installation, or building containing condominiums or individual dwelling units operated as a residential cooperative, but excluding residential buildings having four or fewer dwelling units)." 40 C.F.R. § 61.141. An installation is "any building or structure or any group of buildings or structures at a single demolition site that are under the control of the same owner or operator (or owner or operator under common control)." 40 C.F.R. § 61.141.

Defendants argue that the plain language of the definition of "facility" excludes the single-family residences in the expansion project area.[8] Plaintiff agrees that the NESHAP excludes residential buildings having four or fewer dwelling units, but argues that the airport expansion site is a single demolition site with a common owner; as such, it is an installation, and thus a facility that is subject to the asbestos NESHAP.

Plaintiff relies on two clarifications of the asbestos NESHAP by the EPA in 1990 and 1995 in support of its argument. Defendants characterize the clarifications as invalid attempts at rulemaking without public notice and opportunity for comment, and argue that the clarifications cannot be used to alter the plain language of the asbestos NESHAP itself. If a regulation is clear on its face,

---

[8] The residential exemption could not apply to the commercial structures that were demolished for the airport expansion, and defendants do not argue otherwise.

they assert, no deference is due an agency's attempt at interpretation.

It is undisputed that the city is the owner and operator of the demolished buildings in the airport expansion area. The Court finds that the NESHAP regulation is not clear on its face as to the precise issue at hand, *i.e.*, whether a group of single-family residences constitutes an installation (as plaintiff argues), or whether each residence is a facility that falls within the regulations' exemption (as defendants argue). The Court will consider the EPA's interpretations of the NESHAP.

The Court must give "substantial deference to an agency's interpretation of its own regulations." <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994). The agency's interpretation must be given "controlling weight" unless "it is plainly erroneous or inconsistent with the regulation." <u>Id</u>., <u>quoting</u> <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945).

> This broad deference is all the more warranted when . . . the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns."

<u>Id</u>., <u>quoting</u> <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 697 (1991). "Deference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency's interpretation is the result of thorough and reasoned consideration." <u>Sioux Valley Hosp. v. Bowen</u>, 792 F.2d 715, 719 (8th

Cir. 1986) (citations omitted).  See also S.C. Mgmt. v. Leavitt, 413 F.Supp.2d 1041, 1045 (E.D. Mo. 2005). "While language in the preamble of a regulation is not controlling over the language of the regulation itself. . . the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules." Wyoming Outdoor Council v. United States Forest Serv., 165 F.3d 43, 53 (D.C. Cir. 1999) (citation omitted).

### 1. **The 1990 Preamble**

In 1990, the EPA issued revisions of the asbestos NESHAP following a public notice and comment period.  The prior version of the regulation defined facility as: "any institutional, commercial, or industrial structure, installation, or building (excluding apartment buildings having no more than four dwelling units)." 40 C.F.R. § 61.141 (1989).  The term "installation" was not defined in the prior regulations. Id.

The 1990 revisions added more detail to the definition of "facility" and provided a definition of "installation." The preamble to the 1990 revisions explained the EPA's view that "residential structures that are demolished . . . as part of a commercial or public project" are not exempt from the asbestos NESHAP.  Preamble to 1990 Revisions to Asbestos NESHAP, 55 Fed. Reg. 48406, 48412 (November 20, 1990).  The preamble goes on to state, "For example, the demolition of one or more houses as part of an urban renewal project, a highway construction project, or a project to develop a shopping mall, industrial facility, or other private development, would be subject to the NESHAP." Id.

In a tandem clarification of the definition of "installation," the EPA noted that a "group of residential buildings under the control of the same owner or operator is considered an installation" and is covered by the asbestos NESHAP, even when the buildings are not geographically contiguous. Id. The EPA illustrated as follows:

> As an example, several houses located on [a] highway right-of-way that are all demolished as part of the same highway project would be considered an "installation," even when the houses are not proximate to each other. In this example, the houses are under the control of the same owner or operator, i.e. the highway agency responsible for the highway project.

Id.

The asbestos NESHAP concerns a highly complex and technical regulatory program, and the identification and classification of relevant criteria requires significant expertise and the exercise of judgment grounded in policy concerns. The preamble to the EPA's 1990 revisions of the NESHAP is evidence of its contemporaneous understanding of the regulations, and particularly of the EPA's understanding of an installation.

It is clear to the Court that the EPA's 1990 interpretation was the result of thorough and reasoned consideration. The EPA developed this interpretation contemporaneously with the regulation revisions and following extensive commentary from interested members of the public. The interpretation is not plainly erroneous nor inconsistent with the regulation, and the Court must give the interpretation controlling weight.

The preamble to the 1990 revisions shows that under the EPA interpretation, the asbestos NESHAP applies to residential buildings with four or fewer dwelling units that have a common owner/operator and are demolished as part of the same project, even if those buildings are not geographically contiguous. Such a group is an installation, and thus a facility subject to the NESHAP.

## 2. **The 1995 Clarification**

The 1995 EPA clarification provides further evidence that the EPA's interpretation of the NESHAP supports its application to the instant facts. <u>See</u> Asbestos NESHAP Clarification of Intent, 60 Fed.Reg. 38725-38726 (July 8, 1995).

An interpretative rule merely "reminds affected parties of existing duties." <u>State of Michigan v. Thomas</u>, 805 F.2d 176, 182-83 (6th Cir. 1986), <u>quoting</u> <u>Gen. Motors Corp. v. Ruckelshaus</u>, 742 F.2d 1561, 1565 (D.C. Cir. 1984). If, in contrast, "'by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule.'" <u>Id</u>. The 1995 notice of clarification was not published following a notice and comment period, and the EPA apparently did not intend the notice to create new law, rights, or duties.[9] Accordingly, the Court does not give the EPA's 1995 interpretative rule controlling weight. The interpretative rule, however, is both consistent with the earlier rule and persuasive, and it is thus "entitled to respect."

---

[9] As the Notice itself states: "This notice is intended solely as guidance and does not represent an action subject to judicial review under section 307(b) of the Clean Air Act or section 704 of the Administrative Procedure Act." <u>Id</u>. at 38725.

See Christensen v. Harris County, 529 U.S. 576, 587 (2000) (citations omitted).

The 1995 clarification states that the asbestos NESHAP does not apply to demolition of an _isolated_ residential building with four or fewer dwelling units (emphasis supplied); such buildings fall within the exemption. Clarification of Intent, 60 Fed. Reg. 38725, 38726 (July 28, 1995). But the clarification continues as follows:

> EPA believes that the residential building exemption does not apply where multiple (more than one) small buildings on the same site are demolished or renovated by the same owner or operator as part of the same project or where a single residential building is demolished or renovated as part of a larger project that includes demolition or renovation of non-residential buildings . . . EPA considers demolitions planned at the same time or as part of the same planning or scheduling period to be part of the same project.

Id. at 38725-38726. The EPA also clarified its interpretation of what constitutes a "site":

> [A] "site" should be a relatively compact area. In EPA's view, an entire municipality, or even a neighborhood in a municipality, should not be considered a single site. . . .[I]f a demolition project involves several contiguous city blocks, the entire area could be considered a site. However, EPA believes that demolition of two individual residences separated by several city blocks should not be considered a demolition on a single site. In EPA's view, the area of a site may be larger where the area is owned and operated as a unitary area by a single owner/operator (e.g. a shopping mall or amusement park).

Id. at 38726, n. 3.

### 3.  **Findings**

The Court finds, based on the foregoing, that the airport expansion project site was a single demolition site similar to a

highway project, shopping mall, or amusement park. The site composed an installation that was subject to the NESHAP. The residential exemption does not apply, and the city was required to comply with the NESHAP.

## C. Regulatory Agencies' Approval of Wet Demolitions

Defendants assert that pursuant to delegated authority from EPA and MDNR, the county health department supervised, surveyed and monitored every step of the demolition process. Because the city complied with county regulations (the county health department's "Guideline for Wet Demolition") that were issued pursuant to delegated authority, the city therefore complied with the asbestos NESHAP. Defendants emphasize the city's cooperation and its good-faith efforts to comply with EPA directives after the EPA took a more direct role in the airport expansion project in 2003.

Plaintiff asserts that the county health department had no legitimate authority to allow the airport project demolitions to proceed under requirements less stringent than those imposed by the asbestos NESHAP. Plaintiff further argues that defendants have produced no evidence that EPA or MDNR knew about the Guideline for Wet Demolition (or knew that wet demolitions were occurring) before late 2002, although the city had been performing wet demolitions since October 1999. Plaintiff emphasizes that the EPA itself ultimately determined that the policy outlined in the Guideline for Wet Demolition was not consistent with the NESHAP.

### 1. Delegation and Preemption

In 1981, the EPA delegated to the State of Missouri the authority to administer the NESHAPs, including the asbestos NESHAP. See Delegation of Authority to State of Missouri, 46 Fed.Reg. 27392 (May 19, 1981). MDNR has authority to "sub-delegate the authority to implement and enforce" the NESHAP to local air pollution control agencies, but only "when such agencies have demonstrated that they have equivalent or more stringent programs in place." Id. If it is unclear whether the NESHAP applies and it is necessary to "interpret the regulation," MDNR "should obtain the concurrence of the EPA prior to issuing any determination." Id. The EPA retains "concurrent authority to implement and enforce" the NESHAP following delegation. Id. The EPA also retains the sole authority to approve alternative or equivalent procedures or variances from the NESHAP. Id. As a condition of the delegation, MDNR can allow only activities that comply with the NESHAP and has no authority to "grant a variance" from NESHAP requirements "without the approval of the EPA." Id.

## 2. Airport Expansion Project Notification and Permission Procedures

The airport employed extensive inspection, notification, and permission procedures during the expansion project. Between October 1999 and January 22, 2003, the city performed inspections and notifications as described above (See Part I.B). On January 22, 2003, the EPA informed the City that the wet demolition method did not comply with the asbestos NESHAP. The county health department ceased issuing permits for wet demolitions after January

24

22, 2003, but some demolitions for which the county had already issued permits may have proceeded during this time. After May 1, 2003, wet demolition procedures were conducted pursuant to an Administrative Order on Consent.

The NESHAP requires the owner of a demolition site to notify the EPA of upcoming demolitions. 40 C.F.R. § 145(b). In July 1999, airport demolition managers asked the EPA for guidance on whether, when, and how to conduct these notifications. The EPA replied that the city should direct notifications of asbestos abatement to the county health department only, but must notify EPA of all demolitions as soon as demolition contracts were let, regardless of whether asbestos was present. The city regularly notified the EPA of upcoming demolitions until the EPA informed the city that it was no longer required to do so, effective July 1, 2000.[10]

St. Louis County issued the Guideline for Wet Demolition and local air pollution control ordinances pursuant to the authority

---

[10]    Under 40 C.F.R. § 61.145(b), notifications of all demolitions must include a "[d]escription of planned demolition or renovation work to be employed, including demolition or renovation techniques to be used and description of affected facility components" and a "[d]escription of work practices and engineering controls to be used to comply with the requirements of this sub-part, including asbestos removal and waste-handling emission control procedures." 40 C.F.R. § 61.145(b)(4)(x)-(xi). One of the notifications defendants made directly to the EPA, dated March 15, 2000, was submitted to the Court. See Def. Exh. 30. The notification makes no reference to the method of demolition, and it does not say whether wet demolition would be performed on the listed structures. At least one of the structures listed in this notification, parcel no. 10410, address 12123 Haldane, apparently was wet-demolished pursuant to a clearance letter issued by the County Health Department. See Pl. Exh. 16C at p. 30; Table A, Pl. Exh. 1, at p. 3.

delegated to it by the EPA and MDNR. The county ordinances contain notification requirements that are independent of the NESHAP notification requirements and are discussed below.

### 3. __Involvement of Regulatory Agencies__

On November 13, 2002, MDNR asked the EPA whether a demolition contractor could assume that all of the materials in a building were regulated asbestos-containing material, remove the entire structure under wet conditions, and then dispose of the waste as asbestos containing waste at a specialized facility. The EPA initially replied on November 17, 2002 that the wet demolition procedure described by MDNR would "meet the intent of" the asbestos NESHAP. The EPA then wrote a superseding letter dated January 22, 2003 that required the city to remove all RACM before demolition, with some exceptions. The January 2003 letter quoted in its entirety the provisions of 40 C.F.R. § 61.145(c). The letter stated that "wet demolition (demolition with RACM [regulated asbestos containing material] in place) on a case-by case basis . . . is not consistent with the EPA's asbestos NESHAP regulation."

In May 2003, the EPA and the airport signed an Administrative Order on Consent (AOC), which allowed the project to move forward using wet demolitions. The Court will examine the AOC in detail in a later section of this opinion.

### 4. __Findings__

Plaintiff correctly argues that the county health department and MDNR lacked authority to approve demolition requirements less stringent than those imposed by the NESHAP. Under 42 U.S.C. §

7416, a state or political subdivision "may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation" in effect under 42 U.S.C. § 7411 or 42 U.S.C. § 7412.  The Clean Air Act only preempts state authority as specified, but a state cannot adopt or enforce emission standard less stringent than the federal standard.  The delegation of authority from the EPA to MDNR also reflects the nature of the preemption and the federal statutory "floor".

The evidence establishes that the city had permission from the county health department, MDNR, or the EPA to conduct demolitions of asbestos-containing buildings from 1999 to June 2004, when the EPA, county health department, and city agreed that no further wet demolitions would take place pending an EPA review of the procedure.  Further, it appears that the city's efforts to obtain the necessary permits and supervision were in good faith.

Nonetheless, the county lacked authority to approve practices less stringent than those in the asbestos NESHAP.  The evidence does not show whether the EPA was aware of the content of the county Guideline for Wet Demolition before November 2002, but the EPA ultimately determined in January 2003 that the Guideline was not consistent with the NESHAP.  To the extent the Guideline was less stringent than the NESHAP, it was thus invalid, and the city's reliance on that Guideline, even if taken in good faith, does not absolve it of liability for alleged NESHAP violations.

The Court will now turn to an examination of the wet demolition procedure itself.

D. **Whether the Wet Demolition Procedure Complied with NESHAP**

The physical procedures of wet demolitions evolved between 1999 and 2004. Between October 1999 and May 1, 2003, demolitions were conducted in compliance with the county Guideline for Wet Demolition. St. Louis County stopped issuing permits for wet demolitions after January 22, 2003. However, at least five buildings appear to have been wet-demolished between January 22, 2003 and May 1, 2003.[11] It is not clear whether these were demolitions conducted pursuant to permits issued prior to January 22, 2003. After May 1, 2003, wet demolitions were conducted pursuant to and using the procedures described in the AOC.

1. **Wet Demolition Procedure under the St. Louis County Air Pollution Control Code and the Guideline for Wet Demolition**

The Guideline for Wet Demolition defines a wet demolition as "a demolition of a building that is known to have or suspected of having asbestos containing material (acm). The acm is not removed prior to demolition and all resultant building debris and rubble are removed and treated as contaminated with asbestos." Guideline for Wet Demolition, Feb. 7, 2002. The Guideline states, "A building owner may apply to the agency to conduct a wet demolition rather than asbestos abatement for reasons of safety, cost, and/or

---

[11] The five buildings are: Parcel No. 10627 (4348 Bonfils), demolished January 31; Parcel No. 10452 (12103 Gladshire), demolished February 13; Parcel No. 10819 (14835 Larchburr), demolished January 29; Parcel No. 10902 (4382 Selwyn), demolished February 3; and Parcel No. 11593 (12787 Woodford), demolished February 28. See Table B, Pl. Exh. 16A; Pl. Exh. 16B, 16C, and 16F.

time." <u>Id</u>.  Wet demolitions are evaluated and approved on a case-by-case basis.  <u>Id</u>.  The Guideline specifies the following requirements for a wet demolition:

> Water sprays, e.g. a fire hose with ball valve and fogging attachment, are the primary means of emission control. In addition, site security, e.g. fencing and gates, possible use of security personnel, temporary covering of waste, on-site decontamination of personnel and equipment, and air monitoring may be required. Personnel requirements include worker training and the use of personal protective equipment. As dust is generated it must be controlled so that it does not leave the project area that is demarcated by asbestos warning signs and tape. . . . A thorough inspection for all asbestos containing materials (waived if an unsafe structure) prior to demolition is required. . . All waste generated by the wet demolition activity shall be disposed at a sanitary landfill licensed to accept asbestos.

<u>Id</u>.  Finally, the Guideline requires compliance with St. Louis County Air Pollution Control Code § 612.530, 10 C.S.R. 10 - 6.250 and 40 C.F.R. Subpart M § 61.145.

## 2. <u>St. Louis County Air Pollution Control Code</u>

The St. Louis County Air Pollution Control Code, St. Louis County, Mo. Ordinances, Chapter 612 (2001) (the Code), sets forth notification and permit requirements, detailed asbestos abatement and asbestos waste disposal practices, and air sampling procedures. The Code requires persons demolishing "a structurally sound and safe structure" to "remove ACM according to [§ 612.530-7.4] and all applicable federal requirements; or . . . remove all friable ACM and nonfriable Category II ACM from the building prior to demolition."[12]  Air Pollution Control Code, § 612.530-7.5.1.1-

---

[12] The Code defines friable ACM as: "any material that contains more than one percent (1%) asbestos as determined using. . . . Polarized Light Microscopy, which is applied to ceilings,

7.5.1.2.  Removal of friable ACM must comply with subsection 7.1 of the Code, which mandates the following procedures: isolate the work area with temporary doors or airtight seals of plastic sheeting, maintain reduced air pressure inside the work area, post warning signs, preclean items to be removed from the area and walls and floors with a HEPA-filtered vacuum or wet cleaning method, cover all surfaces with plastic sheeting and seal the edges, continually HEPA filter air in the work area, provide a decontamination area (with a clean room, shower, and equipment room), and provide a totally enclosed waste load-out area. [13]  See Air Pollution Control Code, §§ 612.530-7.1.1.1-7.1.1.6.

The Code further requires that friable ACM must be wetted with "a water solution containing an effective wetting agent" and be kept wet during removal and until the ACM is put in sealed containers for disposal, but the wetting process cannot be used to dislodge the friable ACM.  Air Pollution Control Code, § 612.530-

---

walls, structural members, piping, ductwork, or any other part of a building or facility and which, when dry, may be crumbled, pulverized or reduced to powder by hand pressure." (Code, subsection 9). Category II nonfriable ACM is defined as: "any material, excluding Category I nonfriable ACM, containing more than one percent (1%) asbestos as determined using . . . Polarized Light Microscopy, that, when dry, cannot be crumbled, pulverized or reduced to powder by hand pressure." (Code, subsection 9). Subsection 7.4 of the Code provides for removal of structural or equipment items covered with friable ACM without first stripping the ACM. Polarized Light Microscopy allows asbestos fibers, which are microscopic, to be detected. These definitions are substantially similar to the asbestos NESHAP's definitions of friable and Category I and II nonfriable ACM, to be discussed below.

[13] HEPA is the acronym for High Efficiency Particulate Air filter.

7.1.1.7. After removing the ACM, a person must clean the plastic sheeting with a HEPA-filtered vacuum or by wet cleaning methods, enclose the removed sheeting in plastic, "remove any liquid or solid material that leaks through the plastic sheeting by wet cleaning methods," clean all work area surfaces again, and "then cover all surfaces from which friable ACM has been removed with a distinguishable sealing material." Air Pollution Control Code, §§ 612.530-7.1.1.8-7.1.1.9. Finally, after the sealant dries, the last layer of plastic sheeting is removed, and then air samplers conduct "final clearance air sampling," as per the Code's air sampling procedures. Air Pollution Control Code, § 612.530-7.1.1.10.

The Code imposes no special requirements for removal of nonfriable category II ACM, but the requirements described above apply to "nonfriable ACM which will be rendered friable during removal." Air Pollution Control Code § 612.530-7.1.1.

The Code allows for a waiver of the above requirements; to request a waiver, the person must complete Part B(2) of the Notification Form.[14] Air Pollution Control Code, § 612.530-7.10.3. The Code specifically states: "Compliance with this rule does not relieve the participants from compliance with any other applicable

---

[14] A notification form for 4237 Pont is in the record before the Court; it requests a waiver in Part B(2). Def. Exh. 5, Attachment. The waiver request states that the contractor seeks permission to conduct a wet demolition in accordance with the outdoor abatement procedures codified in the Air Pollution Control Code, § 612.530-7.3.

federal and state rules, laws, standards or building codes." Air Pollution Control Code, § 612.530-2.7.

### 3. **Outdoor Abatement**

Defendants assert that under county procedures developed specifically for the airport expansion project, if asbestos-containing joint compound and wall/ceiling surfacing material were present in a building, the county health department "required the City to treat the entire structure as containing RACM, demolish the structure under St. Louis County regulations for outdoor abatement, and follow St. Louis County work practices for asbestos removal prior to and during demolition." Def. St. of Facts at ¶ 17.

The Code's outdoor abatement regulation applies to the removal of "ACM from structural items and equipment installed in and accessible from outdoor areas." Air Pollution Control Code, § 612.530-7.3. This provision requires a person to "secure doors, windows, or other openings located within one hundred feet (100') of the work area with plastic sheeting," "secure the work area by fences" or other approved means, limit entry to the site to approved persons, and post warning signs. Air Pollution Control Code, §§ 612.530-7.3.1-7.3.2. The provision then requires the person to "wet the friable ACM with a water solution containing an effective wetting agent . . . maintain the friable ACM in an adequately wet condition during removal [and] maintain all debris in an adequately wet condition." Air Pollution Control Code, § 612.530-7.3.3. Wet debris must be placed in a double layer of plastic for disposal, and all friable asbestos containing debris

must be removed from the work area. Air Pollution Control Code, § 612.530-7.3.4. The person must then "clean visible asbestos residue from all surfaces [and] cover all surfaces from which ACM has been removed with an effective distinguishable sealant." Air Pollution Control Code, § 612.530-7.3.5. Finally, the person must "remove outerwear prior to leaving the restricted area." Air Pollution Control Code, § 612.530- 7.3.6.

Thus, the county regulations for outdoor abatement do not require enclosing the structure in plastic, reduced air pressure, a decontamination area, cleaning with HEPA-filtered vacuums or wet cleaning methods, or post-removal air sampling, to name some differences with the indoor abatement ordinances.

Defendants claim that the city complied with the Guideline for Wet Demolition and county outdoor abatement ordinances. The Court finds that compliance with the Guideline and the county Air Pollution Control Code did not relieve defendants of the duty to comply with federal law, as well. See 42 U.S.C. § 7416; and Delegation of Authority to State of Missouri, 46 Fed.Reg. 27392 (May 19, 1981). Indeed, the terms of the Code itself state as much. See Air Pollution Control Code, § 612.530-2.7. The Court will thus examine whether wet demolitions conducted in accordance with the Guideline and the Code also comply with the federal asbestos NESHAP.

### E.   NESHAP Demolition Regulations and Requirements

The NESHAP describes two types of asbestos containing material (ACM), friable and nonfriable. Friable ACM is "any material

containing more than 1 percent asbestos as determined using . . . Polarized Light Microscopy, that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure."[15] 40 C.F.R. § 61.141. Nonfriable ACM is "any material containing more than 1 percent asbestos as determined using . . . Polarized Light Microscopy, that, when dry, cannot be crumbled, pulverized, or reduced to powder using hand pressure." Id.

Category I nonfriable ACM means "asbestos-containing packings, gaskets, resilient floor covering, and asphalt roofing products containing more than 1 percent asbestos." Id. Category II nonfriable ACM means "any material, excluding Category I nonfriable ACM, containing more than 1 percent asbestos . . . that, when dry, cannot be crumbled, pulverized, or reduced to powder by hand pressure." Id.

The NESHAP defines regulated asbestos containing material (RACM) as:

(a) Friable asbestos material,
(b) Category I nonfriable ACM that has become friable,
(c) Category I nonfriable ACM that will be or has been subjected to sanding, grinding, cutting, or abrading, or
(d) Category II nonfriable ACM that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations regulated by this subpart.

Id. The asbestos NESHAP applies to facilities that contain at least 260 linear feet of RACM on pipes or 160 square feet of RACM on other facility components. 40 C.F.R. § 61.145(a)(1).

---

[15] Polarized Light Microscopy is a method of testing for the presence of asbestos. See 40 C.F.R. Pt. 763, Subpt. E, App. E.

RACM must be removed "before any activity begins that would break up, dislodge, or similarly disturb the material or preclude access to the material for subsequent removal." 40 C.F.R. § 61.145(c)(1). RACM does not need to be removed before demolition if:

> (I)    It is Category I nonfriable ACM that is not in poor condition and is not friable;
>
> (ii)   It is on a facility component that is encased in concrete or other similarly hard material and is adequately wet whenever exposed during demolition or
>
> (iii)  It was not accessible for testing and was, therefore, not discovered until after demolition began and, as a result of the demolition, the material cannot be safely removed. If not removed for safety reasons, the exposed RACM and any asbestos-contaminated debris must be treated as asbestos-containing waste material and adequately wet at all times until disposed of.[16]
>
> (iv)   They are Category II nonfriable ACM and the probability is low that the materials will become crumbled, pulverized, or reduced to powder during demolition.

40 C.F.R. § 61.145(c)(1)(I)-(iv).

## 1.    **Whether Asbestos Was Friable**

The parties dispute whether joint compound and wall and ceiling surfacing material were friable ACM. Plaintiff asserts that none of the four exceptions to the requirement that RACM be removed before demolition applied in the instant case, and the city's failure to remove RACM violated the NESHAP. The

---

[16] Plaintiff argues that this subsection's exception is designed to protect the safety of asbestos abatement workers and is commonly referred to as "the wet method" or "wet demolition." Pl. Mem. Supp. Mot. Summ. J. at 3.

effectiveness of the wet method in preventing or reducing asbestos emissions is irrelevant, they say, because the asbestos NESHAP is a strict liability statute.

Plaintiff claims that the only circumstances in which friable RACM can remain in place during demolition are (a) when the material was not discovered until after demolition has begun and it cannot be removed safely, or (b) when the facility is being demolished pursuant to an order of a state or local government agency because the facility is structurally unsound. Defendants admit that the buildings demolished using the wet method (with the exception of the Landscape Building and possibly two fire-damaged homes) were not ordered to be demolished as structurally unsound. Defendants do not contend that the joint compound and surfacing materials were not discovered until demolition had be9gun.

### a. __Inventory Reports__

Plaintiff relies on inventory and inspection reports generated by AHERA inspectors and submitted to the county health department that identify joint compound and surfacing material as friable ACM.

The plaintiff has submitted 100 AHERA inspection reports in evidence. Because the inspectors worked for different companies, the reports are not identical to each other, but they are similar in all material respects. The reports identify the location of asbestos (*e.g.*, ceramic tile adhesive and grout, or wall surfacing materials), the percentage of asbestos present in that location, and whether it was friable. The reports also identify samples

taken from those locations which would later be sent to a lab for testing.

The inspection reports were used to generate asbestos inventory forms which list various asbestos items (*e.g.*, friable pipe insulation, nonfriable floor tile) and the quantity, in square feet.

Plaintiff has also submitted 100 inventory forms. Spaces at the top of the inventory forms are reserved for friable asbestos materials, and spaces at the bottom for nonfriable asbestos. Many items identified as friable asbestos contain a notation that they "[m]ay remain with structure for wet demolition only." See, e.g., Pl. Exh. 16A. Some friable items are denoted, "Removal and disposal by demolition contractor." Id. Many nonfriable items are marked, "Will remain with structure during demolition and disposal." Id. Items denoted "Friable wall system" (drywall and joint compound) and "Friable ceiling/surfacing material" (spray-on textured surface) are consistently marked as items which "may remain with structure for wet demolition only." Id. The 100 inventory forms submitted by plaintiff purport to show that each building contained the threshold amount of asbestos to trigger the NESHAP: in this case, 160 square feet of RACM on other facility components (which applies to drywall, joint compound, and surfacing material). See 40 C.F.R. § 61.145(a)(1); Pl. Exh. 16A-16G.

Finally, plaintiff submits one hundred "clearance" letters from engineering firms submitted to the county health department. See id. The letters identify properties to be wet-demolished,

along with the amount of "[r]egulated friable, nonfriable category I and/or nonfriable category II asbestos-containing materials or assumed asbestos-containing materials which remain in place." Pl. Exh. 16E at p. 56.

     **b.    Affidavits of Joletta Golik and James Moriarty**

Defendants argue that the inventories and reports are insufficient to defeat summary judgment. They submit the affidavit of Joletta Golik, the Environmental Manager for the airport project, who states that "the use of the word 'friable' in [the inventory reports and clearance letters] was not intended to convey that the materials were in fact friable, but rather was intended to convey only that the materials were treated by the St. Louis County Department of Health and the City as if they were friable for purposes of the wet demolition process." Golik goes on to explain that the description of the materials as "friable" allowed the city to take a more conservative approach than if the material had been described as nonfriable. Moreover, in view of the fact that the County Health Department required the city to treat the materials as RACM and knew it would remain in place prior to demolition of the structure, the conservative approach was to be used regardless of how the materials were described.

Defendants also present the affidavit of James Moriarty, a demolition manager with Kwame Building Group during the early months of the expansion who personally observed many buildings in the area. Moriarty related that based on his personal observation, it would not be possible to reduce the joint compound or wall and

ceiling surfacing material to powder using hand pressure. Thus, Moriarty claims the material was not friable within the meaning of NESHAP, even though it was sometimes described as friable on the asbestos inventory forms.

Plaintiff argues that the Court should not consider the Moriarty affidavit because Moriarty was not identified as an expert witness, his affidavit was presented after the close of discovery mandated by the Case Management Order, and plaintiff had no opportunity to depose him. Additionally, plaintiff claims, and defendants do not dispute, that Moriarty left his position as demolition manager in December 1999, and all but one of the 100 wet demolitions alleged to have violated the NESHAP occurred after his departure.[17]

The Court finds that Moriarty could have personally observed the one contested demolition that occurred during his tenure, at 12650 Grandin. See Table B, Pl. Exh. 16A. The Court will not consider the portion of Moriarty's affidavit that relates to the 99 contested demolitions (and specifically, whether the ACM left in place was friable). Those 99 demolitions took place after Moriarty left the project, and he could not have personally observed them. Moriarty's affidavit establishes that the one demolition he could

_____

[17] Moriarty says in his affidavit that he left in December 1999, but he participated in a meeting as Demolition Manager for SPK on March 2, 2000. By June 15, 2000, he was not listed as a participant. Of the 100 demolitions contested by plaintiff, two occurred before June 15, 2000, at 12650 Grandin and at 12123 Haldane. The Court will defer to defendants regarding the date of Moriarty's departure.

have observed did not contain friable ACM, despite being so annotated on the inventory reports.

### c. **David Schau Expert Opinion**

Defendants' expert witness David Schau opines that during "in-place demolition" (wet demolition), "demolition was conducted without the use of explosives, burning, or wrecking balls and therefore there was not a high probability that the ACM would be crumbled, pulverized, or reduced to powder." Schau Report at 2, Def. Exh. 19. Defendants argue that there was a low probability that the asbestos in joint compound and wall and ceiling surfacing materials would become crumbled, pulverized, or reduced to powder during the wet demolitions. Therefore, the joint compound and wall and surfacing material should be categorized as Category II nonfriable asbestos. Thus, defendants reason, 40 C.F.R. § 61.145(c)(1)(iv) applied, and these asbestos containing materials did not need to be removed before demolition began.

Plaintiff responds that the determination of whether ACM is friable is to be made when the material is dry, not when it is wetted during demolition. Compliance with the pre-demolition removal requirement for friable ACM is not excused by applying water to the material during demolition.

Plaintiff's argument is correct as a matter of law. Whether ACM is friable is determined when the ACM is dry, and not when the material has been wetted in preparation for a wet demolition. See 40 C.F.R. § 61.141 (defining friable ACM as "any material containing more than 1 percent asbestos . . . that, when dry, can

be crumbled, pulverized, or reduced to powder by hand pressure.") If the material is nonfriable when dry and the probability is low that it will be crumbled or reduced to powder during demolition, then it does not need to be removed before demolition. 40 C.F.R. §§ 61.141, 61.145(c)(1)(iv). But if material is friable before demolition begins, subjecting it to the demolition process is not likely to make it nonfriable, even when the demolition involves wetting the material. Material must still be inventoried and categorized before demolition begins. <u>See</u> 40 C.F.R. § 61.145(a) ("prior to the commencement of the demolition [owners and operators must] thoroughly inspect the affected facility . . . for the presence of asbestos, including Category I and Category II nonfriable ACM.").

Accordingly, Schau's opinion is unpersuasive and the defendants' argument is incorrect as a matter of law. The city was required to categorize ACM as friable or nonfriable before demolition. The 99 demolitions at issue show that licensed AHERA inspectors categorized joint compound and wall and ceiling surfacing material as friable ACM.

> ### d. <u>Treated as Friable ACM</u>

Defendants assert that the use of the word "friable" in the inspection reports and inventory forms does not prove that the materials were friable under the NESHAP or the Clean Air Act. Defendants argue that the county health department required that the joint compound and surfacing material be "treated" as friable asbestos, even if the materials were not actually friable asbestos.

Plaintiff responds that the NESHAP does not recognize a category of asbestos called "treated as friable" ACM. The Court agrees. The asbestos NESHAP definitions section contains no such category. The regulation requires at least one person trained to identify and handle asbestos and to comply with the NESHAP regulations to be present at all times when RACM is being stripped, removed, handled, or disturbed at the facility. 40 C.F.R. § 61.145(c)(8). Owners and operators are required to provide the EPA in advance with detailed information about demolition projects, including the asbestos-detection methods used, the amount of RACM to be removed before demolition, the amount of Category I and Category II nonfriable ACM to be left in place during demolition, and a description of which facility components will be affected by demolition. 40 C.F.R. § 61.145(b)(4)(v)-(xi). The regulatory scheme requires demolition contractors to locate and conclusively identify asbestos in a building before they begin demolition.

The regulation's specificity is at odds with the defendants' assertion that it was acceptable to treat materials as containing asbestos or to assume they contained asbestos. In addition, the record contains a statement by the EPA (in its January 22, 2003 letter to MDNR) that assuming the presence of friable ACM and wet-demolishing a building does not meet the intent of the NESHAP. Def. Exh. 9. That letter clearly states that owners must comply with the NESHAP regulations as written, in all their complexity.

e. **Findings**

The city relied on the asbestos inspection reports and inventory forms when seeking permission to perform wet demolitions during the expansion project. In the instant motions, defendants rely on the reports and inventories to show they had adequate permission for their course of action. Yet defendants also seek to impeach the contents of those inventories to avoid summary judgment.

The Court finds that defendants have failed to establish a genuine dispute as to whether the asbestos in the 99 buildings at issue was friable. Accordingly, the Court finds that the joint compound and spray-on wall and ceiling surfacing material listed as friable on the 99 inventories at issue was friable ACM within the meaning of the NESHAP.

Defendants do not agree that the reports and inventories are adoptive admissions. However, even if they are construed as such, the defendants argue that the only effect is that the reports and inventories are admitted as non-hearsay material. Nonetheless, defendants still must show that there is a genuine issue of material fact as to whether wet-demolished buildings contained friable ACM. At most, defendants have shown that the city and the county health department created a category called "treated as friable." Because "treated as friable" is not a category recognized by the NESHAP, defendants have not shown they are entitled to judgment as a matter of law.

**2.    <u>Whether friable ACM was removed before demolition</u>**

The NESHAP required the city to remove friable asbestos before demolition if the building contained more than 260 feet of RACM on pipes or 160 square feet on other facility components, which in the case included drywall and wall and ceiling surfaces. See 40 C.F.R. §§ 61.145(a)(1), 61.145(c)(1). Defendants claim that friable asbestos was removed before demolition; plaintiffs claim it was allowed to remain in place in buildings that were wet demolished.

a. **William Dyson Expert Opinion**

Defendants present the report of expert witness William Dyson in support of their assertion that friable ACM was removed from buildings at the airport expansion project prior to demolition. The Dyson report states:

> [W]here large quantities of friable asbestos-containing building materials (ACBMs) were present, asbestos abatement projects utilizing containments were completed prior to demolition of the buildings. In buildings with drywall joint compounds and/or sprayed textured ceilings that contained asbestos, an alternative approach, called "in place demolition," was used. In the "in place demolition" process the entire building was demolished, removed, transported, and disposed as asbestos-contaminated waste.

Dyson Report, Def. Exh. 18, at 2. Nowhere in the report does Dyson state that the friable ACM was actually removed before the demolition.

Dyson also identifies the type of asbestos in joint compound and wall and ceiling texture as a type of asbestos (short fiber chrysotile) to which the short-term exposure of nearby residents would not pose a substantial danger. This, however, is irrelevant, because the NESHAP is a strict liability statute. The NESHAP also does not distinguish asbestos based on fiber length or type; its

44

concern is whether ACM can be crumbled or reduced to powder by hand
pressure. The Court finds that the Dyson report does not create a
fact dispute as to whether friable ACM was removed before wet
demolitions took place.

### b. **Airport Demolition Team Coordination Meetings**

Throughout the expansion project, regular meetings were held
to coordinate the activities of demolition contractors, airport
staff, environmental consultants, and others involved in the
complex process of obtaining permits, submitting notifications, and
scheduling and performing demolitions. Plaintiff submits the
minutes of some of these meetings. At the March 2, 2000
coordination meeting, SPK demolition manager Sheri Blecha said that
SPK "require[s] wet demo for houses greater than one percent." Pl.
Exh. 18 at 20. On June 15, 2000, Rosanna Grabow, contract
administrator for SPK, stated, "Friable asbestos may still remain
with the structures requiring wet demo." Pl. Exh. 19 at 2.

At the September 26, 2002 meeting, Sheri Blecha described
which ACM was removed from a house before wet demolition, and how
the decision was made: "Based on the inventory, I deem if it's
going to be wet or non-wet. If all the drywall is ACM friable, it's
wet. If it's just pieces here and there, I have Thermal go ahead
and abate it prior. It's just a cost decision on our part."[18] Pl.
Exh. 17 at 6. At her deposition, when asked what she meant by this
statement, Blecha explained she meant that if the county had

_____

[18] Blecha also reminded the contractors that they still had
to comply with all NESHAP requirements. Id.

previously approved wet demolition for buildings with the same amount of asbestos, SPK would apply for a wet demolition for the current structure. Blecha Dep. at 47. Blecha denied that she was the person who determined whether a property would be demolished using wet demolition. Id.

   c.  **Findings**

   In summary, the Court finds that the inspection reports and inventory forms establish that the joint compound and surfacing material was friable ACM within the meaning of the NESHAP at the 99 buildings listed in Table B. The defendants' evidence shows that one building's inspection form characterized those materials as friable ACM, but the affidavit of James Moriarty shows that it was not friable.

   The Court further finds that the plaintiff's evidence establishes that friable ACM was left in place in 99 buildings that were wet-demolished. The defendants present no evidence that creates a genuine dispute as to this issue, and have not demonstrated that they are entitled to judgment as a matter of law.

   Of the 99 buildings which contained friable asbestos and were wet-demolished, 35 buildings were demolished before the AOC became effective. Accordingly, the Court finds that the defendants violated the asbestos NESHAP 35 times between January 2000 and May 1, 2003, when the AOC became effective and wet demolitions were thereafter conducted pursuant to its requirements.[19]

_____

   [19] Although defendants state that 255 residential buildings and eight commercial structures were wet-demolished during the

## F. <u>Administrative Order on Consent</u>

Between 1999 and early 2003, wet demolitions were conducted pursuant to clearance letters issued by the county health department. After the Administrative Order on Consent (AOC) became effective on May 1, 2003, wet demolitions were conducted according to the procedures set forth in the AOC. After mid-June 2004, wet demolitions were suspended altogether. Of the 100 wet demolitions that plaintiff contests, 64 were conducted pursuant to the AOC. The parties disagree about the legal effect of the Administrative Order on Consent.

Plaintiff argues the AOC does not establish that the wet demolition method is an alternative work practice authorized by the EPA pursuant to the Clean Air Act. Plaintiff asserts that neither the EPA nor the City complied with the requirements of the Clean Air Act or the NEHSAP for instituting an approved alternative work practice. The EPA did not provide public notice and an opportunity for comment on the AOC, plaintiff says, and the city did not submit a proper written application for an alternative work practice. Plaintiff concludes that the AOC has no legal effect and is not a defense to liability.

Defendants argue that the EPA validly approved the wet demolition method as an alternative work practice when it issued the AOC, and that the EPA followed the applicable procedures

---

airport expansion project, plaintiffs submitted inventory forms and inspection reports for 100 buildings. The evidence thus supports a finding only as to those 100 buildings.

mandated by both the NESHAP and the Clean Air Act. Defendants claim the AOC applies to wet demolitions performed after it became effective, and they assert that the AOC retroactively approved wet demolitions conducted prior to its inception, emphasizing the AOC's statement that the parties intended that "wet demolition would be allowed prospectively" in the "same types of situations as had been allowed in the past." AOC, Def. Exh.11, at ¶ 7.

## 1. Statutes and Regulations Governing Alternative Work Practices

The Clean Air Act describes how the EPA is to devise and enforce regulations related to air pollutants. See 42 U.S.C. § 7412. When possible, the Administrator of the EPA is to set and enforce a numeric limitation on the emission of air pollutants. 42 U.S.C. § 7412(h)(4). Congress recognized, however, that numeric limits might not be possible:

> [I]f it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard.

42 U.S.C. § 7412(h)(1). It is "not feasible to prescribe or enforce an emission standard" in "any situation in which the Administrator determines" that:

> (A) a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal State or local law, or
>
> (B) the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

42 U.S.C. § 7412(h)(2). If the Administrator determines that it is not feasible to prescribe or enforce an emissions standard:

> If after notice and an opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of [42 U.S.C. § 7412(h)(1)], the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

42 U.S.C. § 7412(h)(3).

The NESHAP prescribes work practices for air pollutants including asbestos; it also allows the EPA to approve alternative work practices on a case-by-case basis if certain procedures are followed. Those procedures are outlined in 40 C.F.R. § 61.12, which contains general provisions that apply to NESHAPs for all air pollutants; and in 40 C.F.R. §§ 61.149 and 61.150, which are part of the NESHAP for asbestos.

Subpart A of the asbestos NESHAP, 40 C.F.R. § 61.12, titled "General Provisions," reads in part:

> (d)(1)   If ,in the Administrator's judgment, an alternative means of emission limitation will achieve a reduction in emissions of a pollutant from a source at least equivalent to the reduction in emissions of that pollutant from that source achieved under any design, equipment, work practice or operational standard, the Administrator will publish in the Federal Register a notice permitting the use of the alternative means for purposes of compliance with the standard. The notice will restrict the permission to the source(s) or category(ies) of sources on which the alternative means will achieve the equivalent emissions reductions. . . .
>
> (2)   Any notice under paragraph (d)(1) shall be published only after notice and an opportunity for a hearing.

> (3) Any person seeking permission under this subsection shall, unless otherwise specified in the applicable subpart, submit a proposed test plan or the results of testing and monitoring, a description of the procedures followed in testing or monitoring, and a description of pertinent conditions during testing or monitoring.

40 C.F.R. § 61.12(d)(1)-(3).

The asbestos NESHAP allows an owner or operator of a demolition site to use "an alternative emission control and waste treatment method that has received prior approval by the Administrator according to the procedure described in § 61.149(c)(2)." 40 C.F.R. § 61.150(a)(4). To obtain the Administrator's approval:

> [A] written application must be submitted to the Administrator demonstrating that the following criteria are met:
>
> > (I) The alternative method will control asbestos emissions equivalent to currently required methods.
> >
> > (ii) The suitability of the alternative method for the intended application.
> >
> > (iii) The alternative method will not violate other regulations.
> >
> > (iv) The alternative method will not result in increased water pollution, land pollution, or occupational hazards.

40 C.F.R. § 61.149(c)(2).

## 2. **Whether AOC was alternative work practice under 40 C.F.R. § 61.149**

Plaintiff claims that there is only one procedure for EPA approval of an alternative work practice, found at 40 C.F.R. § 61.12, and the City and EPA did not comply with it. Because the EPA did not provide notice and a hearing before the AOC became effective, plaintiff argues, the AOC therefore is not a validly

approved alternative work practice, and thus has no legal effect. Plaintiff argues that the AOC does not refer to §§ 61.150 or 61.149, and defendants present no evidence they complied with those sections. Plaintiff objects in particular that the city never demonstrated that the wet demolition method's emissions control is "equivalent to" currently approved methods, which is a requirement under both § 61.12 and § 61.149(c)(2).

Defendants argue that the AOC shows that the EPA approved the wet demolition method as an alternative emission control method under 40 C.F.R. § 61.150. Defendants claim the city complied with procedures required by 40 C.F.R. §§ 61.150 and 61.149(c)(2), citing a February 2003 letter from defendants' attorney to the EPA and a multimedia presentation made to the EPA regarding the airport expansion project in April 2003. Def. Exh. 33 and 34. Defendants claim these materials are written applications to the EPA Administrator for an alternative work practice.

The Court finds that the written application procedure in 40 C.F.R. § 149(c)(2) does not apply to demolition and renovation operations, but only to the disposal of the asbestos-laden waste the demolition generates. Section 149 applies to owners or operators "of any source covered under the provisions of § 61.142." 40 C.F.R. § 61.149. The sources covered under § 61.142 are asbestos mills, which are defined as "any facility engaged in converting . . . asbestos ore into commercial asbestos." 40 C.F.R. § 61.141. Although § 61.150 directs owners and operators of demolition operations to comply with various provisions, including

51

the "use of an alternative emission control and waste treatment method" that has received the Administrator's approval under the procedures in § 61.149(c)(2), in context, it is clear that § 61.150 applies to the handling, shipment, and disposal of asbestos containing waste. Section 61.150 does not govern the demolition procedures to be followed; it only specifies the proper method for handling the resulting waste materials. Defendants have not established why, as a matter of law, the less restrictive approval process described in the NESHAP section pertaining to the disposal of asbestos waste should be imported into the demolition and renovation section.

The Court finds that, as a matter of law, the AOC could not be validly issued pursuant to 40 C.F.R. §§ 61.149(c)(2) and 61.150.

Defendants also argue that the county health department's approvals of individual wet demolitions (prior to the 2003 AOC) constitute approval of the wet demolition method as an alternative work practice. This argument fails as a matter of law. The cited provisions, §§ 61.150(a)(4) and 61.149(c)(2), are non-delegable to the States under 40 C.F.R. § 61.157(b). The authority to approve alternative emission control standards and waste treatment methods is retained by the Administrator of the EPA. Id. The EPA specifically retained the authority to approve alternative standards in its delegation of authority to Missouri to administer the NESHAP. See Delegation of Authority to the State of Missouri, 46 Fed. Reg. 27392 (May 19, 1981). The county health department had no valid delegated authority to approve an alternative emission

control standard or work practice pursuant to the NESHAP. Thus, the county's approvals of individual wet demolitions could not constitute alternative emission control standards under the NESHAP.

### 3. **Whether AOC was alternative work practice under the Clean Air Act**

Defendants also rely on 42 U.S.C. § 7412(h)(3) as a basis for the EPA's approval of the wet demolition method. Defendants argue that it was not economically feasible to remove joint compound prior to demolition, and thus the EPA was justified in approving an alternative work practice. However, defendants present no evidence that the EPA approved the wet demolition method as an alternative work practice pursuant to 42 U.S.C. § 7412(h)(3).

Defendants also suggest that § 7412(h)(1) and § 7412(h)(3) provide two separate avenues for the EPA to approve alternative work practices. This argument misinterprets the statutory scheme.

The EPA must promulgate a numeric emissions limitation whenever possible, and if not, the EPA can instead promulgate a work practice. 42 U.S.C. § 7412(h)(1), (4). The EPA may also provide an alternative work practice standard, as long as the alternative is "equivalent to the reduction in emissions . . . achieved under the requirements of" Subsection (1), which in turn is provided in lieu of a numerical emissions standard. 42 U.S.C. § 7412(h)(3).

The asbestos NESHAP is a series of work practice standards that are provided, instead of numerical emissions limitations, to limit asbestos emissions. The only circumstance in which the

asbestos NESHAP allows wet demolition as it was performed at the airport site is when an entire facility containing RACM is demolished under order of state or local government agency because the facility is structurally unsound. See 40 C.F.R. §§ 61.145(a)(3) and 61.145(c)(9). Some NESHAP provisions require materials to be wetted - - - for example, RACM must be wetted during stripping and after it is removed, unless doing so would pose safety risks for abatement workers (as when the temperature drops below freezing). See 40 C.F.R. §§ 61.145(c)(4)(I), 61.145(c)(6)(I), 61.145(c)(7)(iii). No provision of the NESHAP allows an owner or operator to wet demolish a structurally sound building without written approval from the EPA.

The wet demolition method thus is not a specified "work practice" authorized by 42 U.S.C. § 7412(h)(1). The AOC-approved wet demolition method must, under the statutory scheme, be an alternative work practice and must fall under 42 U.S.C. § 7412(h)(3). That provision requires notice and opportunity for comment, and a demonstration that the alternative work practice achieves a reduction in emissions equivalent to the work practice authorized by Subsection (1). The implementing regulations describing how the EPA approves an alternative work practice authorized by § 7412(h)(3) are found in the General Provisions section of Subpart A of the NESHAP, 40 C.F.R. § 61.12. The Court finds that as a matter of law, the city was required to comply with Section 61.12.

**4.  Whether the AOC was validly issued pursuant to 40 C.F.R. § 61.12**

Section 61.12., the general provisions section of the NESHAPs, requires a person seeking permission to use an alternative work practice to "submit a proposed test plan or the results of testing and monitoring, a description of the procedures followed in testing or monitoring, and a description of pertinent conditions during testing or monitoring" to the Administrator of the EPA. 40 C.F.R. § 61.12(d)(3).  The regulation also requires the Administrator of the EPA to provide notice and an opportunity for a hearing and to publish the notice permitting the alternative work practice in the Federal Register. 40 C.F.R. § 61.12 (d)(1)-(2).

The parties have not presented evidence that the EPA provided a notice and comment period before issuing the AOC or that the EPA published notice in the Federal Register after the AOC was issued. The EPA is not a party to this action, and it is not for the Court to determine whether the EPA followed its own regulations and provided public notice, the opportunity for a hearing, or publication of the AOC in the Federal Register. Whether the defendants performed their obligations in seeking approval of the wet demolition method, however, is within the scope of the Court's inquiry.

Defendants argue that the city demonstrated in writing that the wet demolition method controlled emissions equivalent to currently required methods, citing a February 28, 2003 letter from

their attorney to the EPA, and an April 2003 Powerpoint presentation titled "Airport Briefing".

The Court notes that although defendants state that the February 2003 letter enclosed "air monitoring results and other technical documents to support the City's request," those supporting technical documents have not been submitted to the Court.  The letter itself mentions enclosures relating to a project in Fort Worth, Texas, which apparently employed and tested the wet demolition method. The letter also mentions monitoring records obtained from the St. Louis airport site._ Without the supporting documents, the Court is unable to determine whether the city submitted to the EPA the testing and monitoring materials required by the regulation.  Standing alone, the letter is insufficient as a written application for an alternative work practice, because it does not contain a "proposed test plan or the results of testing and monitoring, a description of the procedures followed" therein, and "a description of pertinent conditions during testing or monitoring," as required by 40 C.F.R. § 61.12(d)(3).

Defendants' attorney states that the Airport Briefing was presented to EPA representatives in April 2003 and constitutes a written request for an alternative work practice. See John Cowling Aff., Def. Exh. 32. Defendants provide a printout of the Powerpoint presentation but did not provide a record of the verbal portion of the Airport Briefing proceedings.

The Powerpoint presentation expresses the airport's belief that wet demolition is safe and complies with applicable

regulations, and it states that the EPA has authority to approve an alternative work practice under 40 C.F.R. § 61.150(a)(4). The presentation summarizes the EPA's earlier "approval" of the wet demolition method in its November 17, 2002 letter and its subsequent "mid-course change in the interpretation of asbestos removal regulations" in the January 22, 2003 letter. The presentation emphasizes that the EPA's reversal could bring the airport's "$1.1 billion, 7 year project to an indefinite halt" and would cost "over $25 million and 6 to 12 months of delay on the entire Airport project." The presentation states that instead of a one-day demolition costing "$7,000 per structure for a residential parcel, EPA's change would force work to 5 days and $30,000 per structure." Id. at 13. The presentation does not describe the wet demolition process or mention air monitoring procedures or results. Thus, the Powerpoint presentation is insufficient as a written application for an alternative work practice. See 40 C.F.R. § 61.12(d)(3).

Defendants claim that "over two hundred air monitoring tests were taken" at demolitions during the expansion project. Defendants assert that the average concentration of airborne asbestos was too low to present a risk of asbestos-related disease. Defendants rely on "St. Louis Airport Expansion Demolitions Data Evaluation," prepared by EPA officials on August 6, 2004, and on

the assessment of that evaluation by defendants' expert, William Dyson. Def. Exh. 17 and 18.[20]

The evaluation is a statistical analysis of 36 data sets of air samples taken upwind and downwind of sites that were wet-demolished. The evaluation authors concluded that "the wetting process appeared effective on average in the control of large-fiber [asbestos] release." Id. at 24. The authors provided several caveats: "the data set has many deficiencies," and the data "were not obtained for scientific purposes," although the data were collected by "environmental professionals and some trust must be placed in their expertise and judgment" regarding, for example, wind direction changes and the distance of samplers from the demolition." Id. at 11-12. The authors concluded as follows:

> Given the caveats of this report, no conclusions can be confidently drawn on the effectiveness of the wetting process for individual buildings. . . we cannot infer that there was or was not a release of asbestos. . . . It is our recommendation that scientifically-designed studies be conducted to assess the effectiveness of the wet-demolition process in controlling asbestos release.

Id. at 24.

The Court finds that the evaluation does not demonstrate as a matter of law that the EPA determined that the wet demolition method was "equivalent to" current methods of asbestos emissions control standards and work practices. The evaluation is dated August 6, 2004, more than a year after the AOC became effective and

---

[20] The last page of Exhibit 17 is labeled "Page 24 of 52;" it is not clear whether the pages were mis-numbered or defendants submitted only half of the evaluation for the Court's consideration. The Court will evaluate the exhibit as submitted.

approximately 2 months after wet demolitions were suspended. Thus, the evaluation could not constitute the testing results or procedures required to be submitted by an owner or operator seeking approval of an alternative work practice.

To the extent defendants argue that the evaluation shows that the wet demolitions pose no continuing danger, the Court again finds this to be irrelevant to the issue of whether the defendants violated the NESHAP, a strict liability statute.

William Dyson's deposition testimony about the scientific quality of the airport's air sampling procedures also is irrelevant to the issue of whether the defendants submitted air monitoring procedures or results to the EPA in order to seek approval of the AOC as an alternative work practice.[21]

**5.   Findings**

The Court finds that the defendants have not shown that they complied with 40 C.F.R. § 61.12. As stated above, it is not for the Court to say whether the EPA's course of action was correct, or whether the EPA in fact determined that the wet demolition method was equivalent to existing methods. The defendants nonetheless had an independent duty to comply with obligations the regulations imposed on them, and they have failed to establish that they did so. The defendants have not shown that they provided the EPA with sufficient information to make a determination that the wet

---

[21] Although the Dyson deposition refers to an exhibit containing air-monitoring data from the airport expansion project, the deposition exhibits were not submitted to the Court.

demolition method was "equivalent to" currently required methods of demolishing asbestos-containing structures.

In a comprehensive regulatory scheme such as the Clean Air Act and asbestos NESHAP, the failure of an owner or operator of a pollutant source to comply with regulations cannot be overlooked or excused as having no legal effect, even if the overseeing regulatory agency permits the owner or operator to proceed or suggests it will not be held liable for the violation. (See U.S.E.P.A. v. City of Green Forest, Arkansas, 921 F.3d 1394, 1405 (8th Cir. 1990), quoting Student Pub. Interest Research Group of New Jersey, Inc. v. Georgia-Pacific Corp., 615 F.Supp. 1419, 1427 (D.C. N.J. 1985) ("[A]gency inaction is precisely the circumstance in which private action is appropriate. . . '[Ci]tizen suits . . . are required most [in] instances where an agency encourages a polluter to believe its unlawful behavior will go unpunished.'")

The defendants' failure renders the AOC legally ineffective as a legitimate approval of the wet demolition method as an alternative work practice. Accordingly, the Court finds that the defendants are liable for sixty-four NESHAP violations for wet demolitions conducted pursuant to the AOC.

### G. Resource Conservation and Recovery Act Claim

Plaintiff's complaint alleges that the ACM that the defendants "discarded and disposed of" during wet demolitions was "solid waste" under the Resource Conservation and Recovery Act, Pub. L. 94-580, Oct. 21, 1976, 90 Stat. 2795; 42 U.S.C. § 6903(27). Plaintiff argues that defendants' disposal of solid waste "may

present an imminent and substantial endangerment to health and/or the environment within the meaning of" the RCRA, 42 U.S.C. § 6972(a)(1)(B). Complaint at ¶ 45. Defendants move for summary judgment in their favor on plaintiff's RCRA claim, arguing that plaintiffs have not shown that the city's conduct creates an imminent and substantial endangerment because any potential "release of asbestos fibers was nowhere near the amount necessary to create a threat to health." Def. Mem. in Supp. of Summ. J. at 13. Defendants also maintain that proof of contamination at a site does not also prove that an imminent and substantial endangerment exists.

Plaintiff responds that there is a genuine issue of material fact as to whether the demolition of hundreds of asbestos-containing buildings without NESHAP compliance may present an imminent and substantial endangerment to public health.

The RCRA provides for citizen suits against "any person . . . who has contributed to or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

> To prevail on a claim under § 6972(a)(1)(B), the plaintiffs
> must prove: "(1) that the defendant is a person, including,
> but not limited to, one who was or is a generator or
> transporter of solid or hazardous waste or one who was or is
> an owner or operator of a solid or hazardous waste treatment,
> storage, or disposal facility; (2) that the defendant has
> contributed to or is contributing to the handling, storage,
> treatment, transportation, or disposal of solid or hazardous
> waste; and (3) that the solid or hazardous waste may present

an imminent and substantial endangerment to health or the environment."

*Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1014-1015 (11th Cir. 2004), *quoting* *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 292 (5th Cir. 2001).

Whether a substantial and imminent danger exists is a question of fact. *Raytheon v. McGraw-Edison Co.*, 979 F.Supp. 858, 862 (E.D. Wis. 1997). "Because hazardous substances are, by definition, capable of causing serious harm, a substantial endangerment may exist whenever the circumstances of a release or threatened release of a hazardous substance are such that the environment or members of the public may become exposed to such substances and are therefore put at risk." *U.S. v. Conservation Chem. Co.*, 619 F.Supp. 162, 195 (D.C. Mo. 1985) (rejected on other grounds by *U.S. v. Northeastern Pharmaceutical & Chem. Co., Inc.*, 810 F.2d 726, 741 (8th Cir. 1986)).

The use of the word "may" is "expansive language . . . intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Raymond K. Hoxsie Real Estate Trust v. Exxon Educ. Found.*, 81 F.Supp.2d 359, 365 (D. R.I. 2000), *citing* *Daque v. City of Burlington*, 935 F.2d 1343, 1355 (2d Cir. 1991) (original emphasis), *and quoting* *United States v. Price*, 688 F.2d 204, 213-14 (3d Cir. 1982), (criticized on other grounds by *Morris v. American Nat. Can Corp.*, 941 F.2d 710, 715 (8th Cir. 1991)). Imminence "implies that there must be a threat which is

present *now*, although the impact of the threat may not be felt until later." Meghrig v. KFC Western, Inc., 516 U.S. 479, 486 (1996) (original emphasis). "[A]n endangerment is substantial 'if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken.'" Hoxsie Trust, *supra*, at 366, quoting Lincoln Properties, Ltd. v. Higgins, 1993 WL 217429, *13 (E.D. Cal 1993)(additional citations omitted). Endangerment means "a threatened or potential harm and does not require proof of actual harm." Id. (citations omitted).

One court has found that "compliance (or noncompliance) with federal or state environmental standards is a determinative factor in assessing whether a particular form of contamination presents the possibility of imminent and substantial endangerment." Interfaith Cmty. Org. v. Honeywell Intl, Inc., 188 F.Supp.2d 486, 503 (D. N.J. 2002), citing 3 S. Cooke, The Law of Hazardous Waste, § 15.01[3][e] at 15-11, 15-12 (2001)."

Defendants cite Two Rivers Terminal, L.P. v. Chevron USA, Inc., 96 F.Supp.2d 432 (M.D. Pa. 2000), in support of their argument that proof of contamination does not also constitute proof of an imminent and substantial threat to health. The RCRA claim in the Two Rivers case was decided on the facts and is of little help here. In Two Rivers, efforts to clean up the site, including the removal of contaminated soil, had been ongoing for several years. Id. at 444. Extensive sampling data showed that the concentration of contaminants had decreased. Id. at 445. An environmental study

conducted at the site concluded that the remaining contaminants posed no danger to drinking water because "the high iron content of the groundwater had made it unusable for drinking anyway," and groundwater flowed in the opposite direction from nearby drinking wells. Id. On those facts, the court concluded that an imminent harm did not exist. Id. The facts presented in Two Rivers are distinguishable from the instant facts in too many ways for the decision to aid defendants.

Plaintiff maintains that a fact dispute exists as to whether the wet demolitions may create a substantial and imminent threat of harm. Plaintiff notes that the EPA wrote in 2002 that the failure to remove RACM before demolition "greatly increases the chance of soil contamination, and/or leaving RACM debris at the site." See Pl. Exh. 24. Plaintiff alleges that the EPA evaluation and Landscape Building sampling data show that asbestos was released into the air during wet demolitions. See Def. Exh. 17 and Pl. Exh. 36.

In an evaluation of air-sampling data from the airport, the EPA authors reported they "cannot infer that there was or was not a release of asbestos" during the wet demolitions for which samples were available and analyzed. Def. Exh. 17 at 24.[22]

_____

[22] The evaluation analyzed existing data from air samples taken at wet demolitions at the airport expansion site. Def. Exh. 17 at 6. The data were produced by laboratories, and samples "were archived . . . for thirty days and then disposed." Id. at 7. Those samples were analyzed using Phase Contrast Microscopy (PCM), a method which the evaluation authors noted "misses being able to count up to 99-percent of the asbestos fibers actually present as they are either too short to be counted or too thin to

The city demolished the Landscape Building, which was structurally unsound, in September 2004, collected data during the demolition, and made a report on the data available to the EPA. Pl. Exh. 36 at 1. The EPA's Office of Research and Development prepared a memorandum following their review of the data report. Id. In the memorandum, the EPA stated: "Soil contamination from either airborne or waterborne transport of fibers is always a concern as this could serve as a reservoir for future activity-related releases." Id. at 6. The memorandum also stated that a "significant source of long-term exposure [to asbestos] and subsequent risk can be from settled dust and friable construction debris (or from discarded construction debris that may become friable in the future)." Id. at 9.

The EPA further noted that the airport took eight soil samples at the Landscape Building site, and the soil samples were below the regulatory threshold of asbestos concentration (one percent). Id. at 7. However, the EPA also found that the soil samples were "not particularly helpful at this site, as virtually all the downwind and downgradient area was paved, so the only soil was at the perimeter of the pavement and not subject to waterflow." Id. at 6.

The Court has found that the wet demolition method as used in

_____

be seen." Id. at 6. The authors wrote that the PCM data "will not tell us if asbestos fibers were released." Id. at 24.
The authors reported that another method of analysis, Transmission Electron Microscopy (TEM) was employed, "typically when PCM values were elevated." Id. at 7. The authors characterized the available number of TEM data as "meager" but noted the four downwind TEM measurements were "all either very low or non-detect concentrations." Id. at 24.

the airport expansion project did not comply with the asbestos NESHAP, which was designed to prevent the release of asbestos fibers into the air.  See United States v. Hugo Key and Son, Inc., 731 F.Supp. 1135, 1141 (D. R.I. 1989).  The EPA has stated that failure to remove RACM before demolition can result in soil contamination, and that soil contamination can pose a risk of future activity-related asbestos releases posing a public health threat.

The Court need not determine here whether asbestos was released or whether the soil is or was contaminated as a result. The Court asks, instead, whether possible asbestos contamination may pose a potential future risk.  The Court finds that the evidence currently before it is sufficient to create a factual dispute precluding summary judgment.  The defendants have not shown the absence of a genuine issue of material fact as to whether the wet demolitions conducted at the airport expansion project may create a substantial and imminent endangerment to public health. Accordingly, the Court will deny defendants' motion for summary judgment on plaintiff's RCRA claims.

## IV.  Conclusion

In summary, the Court finds that the asbestos NESHAP applies to the single-family residences at the airport expansion site, and defendants were required to comply with the NESHAP when they demolished those buildings. The defendants' use of the wet demolition method to demolish structurally sound buildings violated the NESHAP, and the approval of the county and the EPA does not

shield defendants from liability.  Because the evidence supports a finding only as to 99 of the wet-demolished buildings, the Court finds that the defendants are liable for 99 violations of the asbestos NESHAP.  To that extent, summary judgment will be granted in favor of plaintiff.  The Court will not grant summary judgment in defendants' favor on plaintiff's RCRA claim, because the plaintiff has shown that a possibility exists that there is asbestos contamination at the site that may pose a future risk of harm.

Accordingly,

**IT IS HEREBY ORDERED** that the plaintiff's motion for partial summary judgment [# 29] is **granted in part** and **denied in part.**

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment [# 26] is **denied.**


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 15th day of September, 2008.