UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| FAMILIES FOR ASBESTOS COMPLIANCE TESTING AND SAFETY, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF ST. LOUIS, MISSOURI, <br><br> Defendant. | Case No. 4:05-CV-719 (CEJ) |

### MEMORANDUM AND ORDER

This matter is before the Court for determination of civil penalties and injunctive relief following a bench trial on plaintiff's claim based on the Clean Air Act, 42 U.S.C. § 7604.[1] Plaintiff asks the Court to impose a civil penalty of $2,732,500 and to order the defendant to implement a beneficial mitigation project. Defendant contends that (1) plaintiff lacks standing because it cannot show that its injuries will be redressed by a favorable decision; (2) there were no violations upon which penalties can be assessed because the City immediately stopped demolitions when approval for the wet demolition method was revoked; (3) even if violations occurred, no penalty should be assessed under the factors enumerated in the relevant statute, 42 U.S.C. § 7413(e)(1); and (4) plaintiff has failed to put forward evidence to establish that the soil testing program it seeks is necessary or appropriate.

On September 15, 2008, the Court granted partial summary judgment in favor of plaintiff Families for Asbestos Compliance, Testing and Safety (FACTS) after finding that the defendant City of St. Louis had committed 99 violations of the National Emission Standard for Hazardous Air Pollutants (NESHAP) for asbestos. On February

---

[1]At trial, plaintiff dismissed its claim brought pursuant to the Resource Conservation and Recovery Act , 42 U.S.C. § 6972(a)(1)(B).

17 and 18, 2009, the Court received testimony and evidence at a bench trial on plaintiff's claims for civil penalties and injunctive relief under 42 U.S.C. § 7413(b).

I. **Background**

This lawsuit arises from the City's demolition of approximately 2,000 residential and commercial structures to make way for a new runway at Lambert St. Louis International Airport. The airport is owned and operated by the City. The demolished buildings were located in Bridgeton, Missouri. Many of the buildings contained asbestos in floor tiles, drywall joint compound, and sprayed-on ceiling material.

The demolition of buildings containing asbestos is governed by regulations (the asbestos NESHAP) promulgated by the Environmental Protection Agency (EPA). The EPA delegated the authority to administer the asbestos NESHAP to the State of Missouri. The State, through the Missouri Department of Natural Resources (MDNR), in turn delegated its authority to the St. Louis County Department of Health (County Health Department) with respect to demolitions occurring at the airport, which is located in St. Louis County.

The City was required to obtain a permit from the County Health Department in advance of each demolition. Included with the permit applications were reports from environmental consultants who tested samples of the drywall joint compound and ceiling material. If the samples contained greater than one percent asbestos, the County Health Department deemed the entire wall and ceiling -- including the drywall, adjacent framing, and insulation -- to be cross-contaminated. There was uncontroverted testimony that, under this circumstance, the County Health

Department required the City to leave the asbestos-containing materials in place and use a wet demolition method to remove the entire structure.[2]

Demolitions began in October 1999. On November 13, 2002, the MDNR wrote to the EPA to inquire whether the wet demolition method complied with NESHAP requirements. The EPA response, dated November 14, 2002, stated that properly completed wet demolitions would meet the intent of the asbestos NESHAP. Two months later, however, the EPA reversed itself and, in a letter written on January 22, 2003, stated that the County Health Department's wet-demolition policy was not consistent with the NESHAP. The County Health Department stopped issuing permits and demolitions ceased. The wet demolition method had already been used to remove 191 residences.

Thereafter, the Airport sought the EPA's approval of the wet demolition method. After extensive negotiations,[3] an Administrative Order of Consent (AOC) was entered into, effective May 1, 2003, that authorized the County Health Department to issue permits for wet demolitions. Sixty-four residential structures were removed under the AOC. On June 11, 2004, the City, the EPA, and the County Health Department agreed to suspend wet demolitions.

No further wet demolitions were done after the June 2004 agreement. Additionally, there are no remaining structures to be demolished in connection with the Airport Expansion Project.

The City conducted air monitoring at 36 wet-demolition sites. The monitoring was not required by any of the regulatory agencies but was undertaken as a quality

---

[2]Asbestos-containing floor coverings were removed by traditional abatement practices so that the concrete slab could be broken up for use as clean fill.

[3]The DNR and regional office of the EPA supported the City's assertion that wet demolitions complied with the asbestos NESHAP.

control measure in order to ensure that the approved demolition method was being implemented by the several different contractors. Air samples were taken upwind and downwind from the site and compared using Phase Contrast Microscopy and Transmission Electron Microscopy. The data generated from the samples were subsequently provided to the EPA's Office of Research and Development (ORD) for evaluation.

The ORD released a report on August 6, 2004. Subject to some caveats,[4] the authors concluded that there was no indication that the wet-demolition method caused the release of asbestos fibers. R. Wilmoth et al. St. Louis Airport Expansion Demolitions Data Evaluation. (Pl. Tr. Ex. 30). A review of the data indicated no statistically significant difference between the up- and down-wind samples and, thus, no indication that the wet demolition method resulted in the release of asbestos. The authors concluded that the wet demolition process "appeared effective on average in the control of large-fiber release." Id. at 24. Given the caveats, however, the authors stated that "no conclusions can be confidently drawn on the effectiveness of the wetting process for individual buildings." Id. (emphasis added).

William L. Dyson, Ph.D., an industrial hygienist, testified at trial as an expert on exposure and disease risk assessment. The asbestos in the homes demolished using the wet method was of the chrysotile type, which has the lowest exposure risk for the disease mesothelioma. Dr. Dyson testified that the critical element in determining risk is the "exposure dose," which is a function of the exposure duration and exposure intensity. In this case, the exposure duration was four to six hours per demolition.

---

[4] The data were not collected for the purposes of a scientific study and thus there was no information regarding the placement of air samplers or the constancy of the wind direction. The authors noted, however, that "some trust must be placed in [the] expertise and judgment" of the environmental professionals who collected the data. Id. at 11-12.

The air sampling data established that the exposure intensity was quite low.[5] These data were consistent with recently-published findings regarding the release of asbestos fibers during demolition. He calculated that the exposure dose was several orders of magnitude less than the lowest exposure dose associated with risk of disease. In Dr. Dyson's opinion, the disease risk associated with asbestos exposure as a result of the demolitions in the airport expansion zone is less than one in one million and probably in the order of one in ten million.[6] By comparison, he testified, the lifetime risk of death from driving to work is about two in one thousand and the lifetime risk of being hit by lightning is about seven in ten thousand.

Dr. Dyson testified that there was also no risk to health presented from asbestos potentially left in the soil following wet demolitions. First, asbestos fiber in soil has to become airborne and be inhaled in order to pose a health risk. The demolition procedure was concluded with visual inspection to remove any visible asbestos. The demolition site was then graded and planted with a ground cover. These steps would significantly reduce the amount of asbestos left in the soil. Second, asbestos fibers become tightly bound with the soil and are unlikely to become airborne; with time, the asbestos fibers leach away. Digging in the soil presented no concerns because the concentrations of asbestos were so low that any emissions would be harmless. With respect to plaintiff's request for soil testing, Dr. Dyson testified that, at present, there are no criteria for determining when soil testing should be conducted and no criteria for determining whether remediation of soil has been achieved. Dr. Dyson opined that

---

[5]Dr. Dyson stated in his expert report that it would require continuous exposure for 120 years at the recorded downwind concentrations to reach the minimum exposure dose associated with risk of disease. (Def. Tr. Ex. L).

[6]In reaching this conclusion, Dr. Dyson calculated the disease risk associated with the maximum possible exposure dose; *i.e.*, for someone who was present for the duration of each demolition.

only minute amounts of asbestos would have remained in the soil at the demolition sites. He further opined that there is no significant asbestos exposure risk to people walking near the airport expansion area, because there were no significant releases of asbestos during the demolition.

Plaintiffs did not present expert testimony with respect to disease risk associated with the wet demolitions. Two of plaintiff's members, who lived near buildings that were wet-demolished, testified that during the demolitions they noticed an increased amount of dust in their homes. There was no evidence as to whether this dust contained asbestos or, if so, to what level. Audrey Russell moved from the airport expansion area in June 2006, but she returns to the neighborhood twice a month to walk her dogs in a park adjacent to an area where wet demolitions were conducted. Carole Donnelly moved from the expansion area in June 2005, but has returned there 25-30 times since then. She testified that she would not use the park until it was cleaned up because she considers it unsafe.

II. Discussion

In a post-trial memorandum, defendant contends that the plaintiff lacks standing to seek civil penalties and injunctive relief under the Clean Air Act.[7] Plaintiff suggests that defendant should not be allowed to assert this argument at this late stage of the proceedings. However, the question of standing "is jurisdictional and not subject to waiver." Lewis v. Casey, 518 U.S. 343, 349 n.1 (1996). "The federal courts are under an independent obligation to examine their own jurisdiction and standing is perhaps the most important of [the jurisdictional] doctrines." United States v. Hays,

---

[7]Defendant asserted lack of standing as an affirmative defense in its answer, but did not raise the issue in any motion. The Court conducted the first half of the standing analysis without reaching the question of redressability that defendant now asserts.

515 U.S. 737, 742 (1995) (alteration in original) (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31 (1990)). And, although standing is usually addressed at the "earliest stages of litigation, . . . it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 115 n.31 (1979). Thus, the question is properly before the Court.

The "case" or "controversy" requirement of Article III is the "irreducible constitutional minimum" of standing. Bennett v. Spear, 520 U.S. 154, 167 (1997). "There must be a 'personal stake in the outcome' such as to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" O'Shea v. Littleton, 414 U.S. 488, 494 (1974) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

An association has Article III standing to bring suit on behalf of its members when (1) its individual members have standing in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) the relief sought does not require the participation of individual members. Hunt v. Washington State Apple Advertising Com'n, 432 U.S. 333, 342-43 (1977). Elements two and three are not at issue in this case. An association's individual members have standing if: (1) they have suffered an "injury-in-fact"; (2) the injury is "fairly traceable" to the challenged conduct of the defendant; and (3) the injury will likely be redressed through the relief sought in the complaint. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103-04 (1998). The burden of establishing each of these elements rests on the party seeking to invoke the court's jurisdiction. Lujan, 504

U.S. at 561. In addition, standing must be demonstrated for each form of relief sought. Friends of the Earth, Inc. v. Laidlaw Environmental Svces. (TOC), 528 U.S. 167, 185 (2000).

At issue here is whether plaintiff can establish that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561. Two Supreme Court cases are instructive with respect to the parameters of redressability in citizen suits:

In Steel Co., respondent, described as "an association of individuals interested in environmental protection," brought suit to recover civil penalties and injunctive relief for alleged violations of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA). 523 U.S. at 86. The Supreme Court found that the association, through its pursuit of civil penalties, sought "not remediation of its own injury . . . but vindication of the rule of law," which would not suffice to confer standing. Id. at 106. The Court further found that because the respondent alleged only past infractions of the EPCRA, and not any continuing or possible future violations, "injunctive relief will not redress its injury." Id. at 109. Because "none of the relief sought by respondent would likely remedy its alleged injury in fact," the Court concluded that respondent lacked standing and the lower courts lacked jurisdiction to hear the case. 523 U.S. at 109-10.

Two years after its decision in Steel Co., the Supreme Court addressed a citizen suit brought under the Clean Water Act. In Laidlaw, the record showed that the defendant had continued to violate the limits of its discharge permit after suit was filed but ceased before judgment was entered. 528 U.S. at 177. The Court of Appeals held that the case was mooted by defendant's compliance with terms of its permit. On review, the Supreme Court ruled that it was error to dismiss the case on grounds

of mootness and that "the Court of Appeals [had] incorrectly conflated our case law on initial standing to bring suit, see, *e.g.*, Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), with our case law on postcommencement mootness, see, *e.g.*, City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)." Id. at 173-174. Under Steel Co. and Laidlaw, plaintiff must prove that defendant was in fact violating the Clean Air Act at the time the complaint was filed or that future violations were imminent. Cambrians for Thoughtful Development v. Didion Milling, Inc., 571 F.Supp.2d 972, 978 (W.D. Wis. 2008); Anderson v. Farmland Indus., Inc., 45 F. Supp.2d 863, 871 (D. Kan. 1999).

Plaintiff asserts that the Clean Air Act is exempt from the standing rule of Steel Co. and Laidlaw, by virtue of an amendment in 1990. In 1987, the Supreme Court held that a citizen suit under the Federal Water Pollution Control Act[8] could be brought only if plaintiff alleged in good faith that defendant was violating the act at the time suit was filed. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49 (1987). In 1990, Congress amended the Clean Air Act to permit citizen suits "against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation" of an emission standard. 42 U.S.C. § 7604(a)(1). Some of the legislators indicated that the purpose of this amendment was to reverse the holding in Gwaltney. See Clean Air Acts Amendment Conference Summary, 136 Cong. Rec. S18,037-02, S18,040, 1990 WL 206800 (Oct. 24, 1990) ("Finally, in response to the Supreme Court ruling in Gwaltney of Smithfield,

---

[8]At the time of the Gwaltney decision, the FWPCA (the precursor to the Clean Water Act) and the CAA both provided that "any citizen" may bring suit against "any person . . . who is alleged to be in violation of" the pollution limitations. 33 U.S.C. § 1365(a); 42 U.S.C. § 7604.

Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49 (1987), the conference agreement allows citizen suits to be brought with respect to past violations if there is evidence that the violation has been repeated.") (statement of Sen. Baucus). Other legislators contended that the purpose was to codify Gwaltney. See Conference Report on S. 1630 - the Clean Air Act Amendments, 136 Cong. Rec. E3694-02, E3695, 1990 WL 206981 (Oct. 26, 1990) ("[W]e modified the citizen suit provision on past violations to conform to the Supreme Court's Gwaltney decision.") (statement of Rep. Lent).[9] Thus, the legislative history is ambiguous with respect to whether Congress intended to expand standing under the Clean Air Act to wholly past violations.

Plaintiff cites to a number of cases in which district courts have found that the amended language of the Clean Air Act permits citizen suits based solely on past violations, so long as there is proof that the violations were repeated. See Patton v. General Signal Corp., 984 F. Supp. 666, 672 (W.D.N.Y. 1997); Fried v. SunGard Recovery Servs., Inc., 916 F. Supp. 465, 467 (E.D. Pa. 1996); Adair v. Troy State Univ., 892 F. Supp. 1401, 1409 (M.D. Ala. 1995). Other courts have found that standing to bring a citizen suit under the Clean Air Act depends upon an allegation of ongoing violations at the time the complaint is filed. See Cambrians for Thoughtful Development v. Didion Milling, Inc., 571 F.Supp.2d 972, 978 (W.D. Wis. 2008) (finding

---

[9]Attorney General Dick Thornburgh wrote the following statement to Sen. Robert Dole, who read it into the congressional record:

> This is to advise you of my very serious concerns over language concerning citizen suits that is now being put forward for the enforcement title of the Clean Air Act amendment. This language would . . . permit such suits for nonrecurring past violations [and] would raise important questions under Article II and Article III of the Constitution and would go far beyond the existing framework of our environmental laws, as shown in the Supreme Court's recent decision in Gwaltney of Smithfield v. Chesapeake Bay Foundation, 108 S.Ct. 376 (1987).

Clean Air Acts Amendment Conference Summary, 136 Cong. Rec. S3162-04, S3180 (Mar. 26, 1990), 1990 WL 45176.

no standing where undisputed violations of the Clean Air Act all occurred before suit commenced); Public Citizen v. American Elect. Power Co., 2006 WL 3813766 at *6 (E.D. Tex. Dec. 27, 2006) (applying Laidlaw to Clean Air Act citizen suit and finding sufficient allegations ongoing or potential future violations); St. Bernard Citizens for Environmental Quality, Inc. v. Chalmette Refining, L.L.C. 354 F.Supp.2d 697, 705 (E.D.La. 2005) (applying Laidlaw to determine that plaintiffs had standing where defendant continued to violate its permit after suit commenced); Berry v. Farmland Industries, Inc., 114 F.Supp.2d 1150, 1154 (D.Kan. 2000) (applying Steel Co. and Laidlaw to determine that plaintiffs lacked standing in the absence of facts that defendant was violating the Clean Air Act or that future violations were imminent when suit was filed); Anderson v. Farmland Indus., Inc., 70 F. Supp.2d 1218, 1227-28 (D. Kan. 1999) (evidence of continued violations sufficient to confer standing); Lead Awareness Environmental Development (LEAD) v. Exide Corp., 1999 WL 124473 at *15 (E.D. Pa. Feb. 19, 1999) ("While the CAA concept of past violations is seemingly at tension with the constitutional standing requirement in Steel [Co.], . . . the two concepts can be reconciled[. P]ast violations may meet the redressability requirement of standing only if they have the possibility of being repeated in the future. In other words, a plaintiff may assert random past violations of the CAA and satisfy the redressability requirement by a presumption that there is a potential ongoing compliance problem or a possibility that such violations may be repeated").

"It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997). "Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one 'who otherwise would be barred by prudential standing rules.'"

Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)). "In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself' . . . that is likely to be redressed if the requested relief is granted." Id. at 100.

To establish the redressability element of standing, plaintiff must prove that defendant was either (1) violating the asbestos NESHAP of the Clean Air Act at the time the complaint was filed or (2) that future violations were imminent. The evidence shows that the wet demolitions ceased in June 2004. Thus, all of the violations for which penalties are sought were committed before May 5, 2005, the date the complaint was filed. Plaintiff thus must establish that future violations were imminent.

As plaintiff notes, it is undisputed that defendant hoped to resume the wet demolitions -- 45 residences remained intact because the County would not approve traditional abatement procedures. The City vigorously sought the EPA's approval of the wet demolition method. Plaintiff argues that the City's lobbying of the EPA proves that future violations were imminent, but the City's actions were nothing more than a good faith effort to clarify its legal rights and obligations under the NESHAP. The record establishes that defendant was scrupulous in its efforts to comply with the regulatory and permitting requirements of the EPA, the MDNR, and the St. Louis County Health Department. This record of good-faith attempts to comply does not support a finding that future violations of the NESHAP were imminent.

Plaintiff further argues that its request for a mitigation project affords it the potential for redress for the purpose of Article III standing. The Clean Air Act provides the Court with the discretion to order that up to $100,000 in civil penalties "be used in beneficial mitigation projects." 42 U.S.C. § 7604(g)(2). "Mitigation projects

pursuant to § 7604(g) can, under certain circumstances, supply the necessary redress to support standing." Cambrians, 571 F.Supp.2d at 981. However, plaintiff must show more than a generalized public benefit deriving from the mitigation project. See Laidlaw, 528 U.S. at 181 ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.")

In this case, plaintiff seeks an order directing defendant to implement a plan to sample soil in the airport expansion area and to restrict public access to any areas found to be contaminated by asbestos. A soil testing program will not lead to a determination of whether plaintiff's members inhaled asbestos during the demolitions, and, as Dr. Dyson testified, soil testing will not allow for a determination of whether asbestos in the soil has been remediated. Despite their concerns about asbestos contamination in the area near the demolitions, plaintiff members Donnelly and Russell still frequent the area. Clearly, use restrictions will have no effect on these individuals as they have continued to frequent an area that they already believe is unsafe. Thus, neither soil testing nor use restrictions will alter the status quo and will not confer any benefit on plaintiff or its members. Furthermore, the areas to which the public has access are owned by the City of Bridgeton and are not under the control of the City of St. Louis. Plaintiff cannot establish redressability on the basis of a remedy that is not in the defendant's power to provide.

Based on all of the evidence, the Court finds that plaintiff has failed to establish that violations of the Clean Air Act were occurring or were imminent at the time it filed its complaint. Thus, the Court concludes that plaintiff lacks standing to bring a claim under the Act.

Accordingly,

**IT IS HEREBY ORDERED** that Count I of plaintiff's complaint is **dismissed** for lack of standing.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of July, 2009.